## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MARYLAND

VANE LINE BUNKERING, LLC and THE VANE
BROTHERS COMPANY,

Plaintiffs,

v.

HARRY SCHMITT, MAXWELL SCHMITT, JOHN
BARBARISE III, ANKORA FUELS, LLC, ANKORA
MARINE TRANSPORT, LLC; and ANKORA
MARINE HOLDINGS, LLC,

Defendants.

Case No.

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs, Vane Line Bunkering, LLC ("Vane Line") and The Vane Brothers Company ("Vane Brothers," and together with Vane Line, "Plaintiffs" or "Vane"), by and through their undersigned counsel, hereby file suit against Defendants Harry Schmitt ("Harry"), Maxwell Schmitt ("Maxwell," and together with Harry, the "Schmitts"), John Barbarise III ("Barbarise"), Ankora Fuels, LLC ("Ankora"), Ankora Marine Transport, LLC ("AMT"), and Ankora Marine Holdings, LLC ("AMH," and together with Ankora and AMT, the "Ankora Entities") (collectively, "Defendants") and allege as follows:

## NATURE OF THE ACTION

1. This case presents a stunning array of disloyal, self-serving, and wrongful actions by two former longtime Vane employees and brothers, Defendants Harry and Maxwell Schmitt. Until recently, the Schmitts occupied senior positions at Vane, a leader in the maritime transport and logistics industry providing petroleum transportation services: Maxwell served as Director of Fleet Logistics, and Harry worked as a Chartering and Scheduling Manager. In those roles, the

1

Schmitts had access to numerous confidential and sensitive materials, including strategy, pricing, and contracts relating to Vane and its customers. For obvious reasons, the Schmitts were contractually obliged to keep those materials confidential. They were also obliged, by contract and their fiduciary duties, to use that information only in service of, and to otherwise act, in Vane's best interests.

2. The Schmitts violated both their contractual and fiduciary obligations many times over. Vane has recently learned that for years, the Schmitts have been secretly misappropriating and using Vane's confidential information and trade secrets for their own benefit and for the benefit of Vane's direct competitors, including Defendants Barbarise and the Ankora Entities, and others. Worse still, there is a clear and present risk that they will continue to do so in the future.

3. Maxwell abruptly resigned from Vane on December 26, 2025. In the weeks prior, even though Maxwell had just received a promotion to the Director of Fleet Logistics position, he had expressed dissatisfaction after a less senior employee was promoted to Vice President of Fleet Logistics and became Maxwell's direct supervisor. Maxwell began acting erratically – among other things, working from home for undisclosed personal reasons and taking off work without explanation. During this same period, both Maxwell and Harry also voiced increasing dissatisfaction with Vane to co-workers, and Harry abruptly refused to continue performing certain duties and rejected opportunities to assume expanded responsibilities.

4. Vane, suspicious of these developments, began monitoring and investigating the Schmitts' use of company-issued devices. That investigation exposed significant wrongdoing by both brothers dating back more than eight years.

5. *First*, beginning in or around mid-2023, shortly after Barbarise left his former employer and began forming the Ankora Entities, Harry secretly cultivated a relationship with

Barbarise while occupying a position of trust at Vane and maintaining unfettered access to Vane's most sensitive business systems, market research, customer data, pricing, and operational information. While employed by Vane, Harry used Vane's time, systems, and trade secrets to assist the Ankora Entities' competing business. By no later than mid-2025, Harry brought Maxwell into the scheme. Thereafter, Harry and Maxwell worked together in coordination with Barbarise to enable the Ankora Entities to compete directly with Vane, solicit work away from Vane's longstanding customers, replicate Vane's business model, and divert work from Vane. Harry and Maxwell did this by communicating extensively with Barbarise during business hours while accessing and viewing Vane's proprietary systems, and by covertly downloading, retaining, and transmitting Vane's confidential information. Defendants' misconduct was deliberate, concealed, and undertaken while Harry and Maxwell remained employed by Vane, in direct violation of their contractual and fiduciary obligations, resulting in substantial and ongoing harm to Vane's business, goodwill, and competitive position.

6.  *Second*, and equally troubling, while employed by Vane, both brothers exploited Vane's confidential information, proprietary systems, and company time to perform work for the Ankora Entities in direct competition with their employer. Communications between the brothers and Barbarise indicate that Barbarise was providing gifts, compensation, and other incentives to Harry and Maxwell in exchange for work performed on behalf of the Ankora Entities and/or access to Vane's confidential information and proprietary systems. For example, Harry repeatedly thanked Barbarise for cards and gifts following their frequent lunches:

HS  **Harry Schmitt**                                                    7/10/2024, 1:45 PM

Hey man, thank you for lunch and the Yeti. The shirt is great, really nice - will absolutely wear it. And of course thank you for the other. Really didn't have to do that and it's too much, but I really, really do appreciate it, thank you very much John. Will make sure we get this thing done. Talk soon and thanks again man

JB  **John Barbarise**                                                   7/10/2024, 1:47 PM

You got it. Thanks for meeting and I appreciate all the help and just your general support. I hope it works out but I feel good that you're going to try your best.

Glad you like the shirt. It was our first trial run but I think they are solid. Next ones I voted to put logo on sleeve lol

HS  **Harry Schmitt**                                                   7/10/2024, 1:50 PM

I'm confident we'll get it done. And I'll have to look at the shirt more when I get home, but really liked it when I pulled it out in the car, well done

\*\*\*

JB  **John Barbarise**                                                 10/10/2024, 10:15 AM

Give me a call at some point before you head out. Wanted to ask something

HS  **Harry Schmitt**                                                  10/10/2024, 10:30 AM

K - give me 5. You need me in front of a computer?

JB  **John Barbarise**                                                 10/10/2024, 10:36 AM

Liked "K - give me 5. You need me in front of a computer?"

HS  **Harry Schmitt**                                                  10/10/2024, 3:57 PM

Thank you both very much for the cards, for lunch, and the vote of confidence. Will be in touch soon

JB  **John Barbarise**                                                 10/10/2024, 4:00 PM

You got it. Talk soon. Let me know if any issues

\*\*\*

HS  **Harry Schmitt**                                                   3/6/2025, 1:44 PM

Thank you for the cards and for lunch, you don't have to but I certainly aappreciate it- we'll talk soon and get this sorted

7.      *Third*, Vane's investigation revealed that Harry and Maxwell's misconduct was anything but an isolated occurrence.  After leaving Vane to work for a direct competitor, Harley Marine Services, Inc. ("Harley Marine") in 2017 and 2018, Harry misappropriated Vane's confidential and proprietary information to assist Harley Marine in competing against Vane.  At the same time, Maxwell—who remained employed by Vane—transmitted Vane's confidential information and trade secrets to Harry to use for the benefit of Harley Marine.

4

8.    For example, in August 2017, Harry instructed Maxwell to "take pictures of SAIL and all the tabs"—referring to Vane's proprietary logistics and dispatching platform, discussed in detail below—because Harley Marine was "revamping their dispatching system:"[1]  Indeed, Harry told Maxwell to take those pictures "from Stephen's computer at home"—a reference to their father Stephen Schmitt, at the time also a Vane employee—to avoid detection.  Maxwell knew the whole effort was wrongful; as he responded to Harry: "Thinking like a true villain."

| | | |
|---|---|---|
| UM | **Unknown Party@Native Messages**<br>Yeah, hopefully it works out. Also talked to them about revamping their dispatching system - so you need to take pictures of SAIL and all the tabs and shit | 8/16/2017, 7:11 PM |
| MS | **Max Schmitt**<br>Dear lord. | 8/16/2017, 7:11 PM |
| MS | **Max Schmitt**<br>Let me put my turtleneck on | 8/16/2017, 7:11 PM |
| UM | **Unknown Party@Native Messages**<br>You mean tactleneck | 8/16/2017, 7:12 PM |
| MS | **Max Schmitt**<br>Aha. | 8/16/2017, 7:12 PM |
| MS | **Max Schmitt**<br>Yes I do. Slightly darker black | 8/16/2017, 7:12 PM |
| UM | **Unknown Party@Native Messages**<br>Lol you can take pics from Stephen's computer at home | 8/16/2017, 7:13 PM |
| MS | **Max Schmitt**<br>Perfect. | 8/16/2017, 7:13 PM |
| MS | **Max Schmitt**<br>Thinking like a true villain | 8/16/2017, 7:13 PM |
| UM | **Unknown Party@Native Messages**<br>Of course lol | 8/16/2017, 7:13 PM |

Maxwell proceeded to send Harry multiple screenshots containing confidential information from that proprietary system, as well as a two-and-a-half-minute video recording of Maxwell scrolling through information within the system.

---

[1] In screenshots of the text messages cited herein, the sender identified as "Unknown Party@Native Messages" corresponds to Harry Schmitt.

9.      Harry was fully aware of the value—and sensitivity—of access to Vane's proprietary SAIL system.  As he put it in a text message from a different time, using SAIL, someone could "run the entire company from just that program alone":

> **HS**   **Harry Schmitt**                                             2/10/2025, 1:25 PM
> Yeah that's awesome man, I really think the new towing program all ironed out is going to be a total game changer. It's something that's so long overdue for an upgrade, so this is perfect you're jumping into it. Eric and I were talking last week about how we wish we could have you literally just go from group to group, department to department, and do exactly what you're doing now, and literally upgrade the entire company. But I also do think SAIL is 100% the best place to start. I f*ing love that program. I've always said, give me SAIL, and I can run the entire company from just that program alone

10.      Later in August 2017, while he was in the midst of taking pictures of the SAIL system, Maxwell texted Harry, "Eventually I want to get paid for this."  Tellingly, Harry responded "That's the goal," reflecting their shared understanding that Maxwell's disclosures of Vane's confidential information were being made for their personal benefit, rather than for any legitimate business purpose:

> **MS**   **Max Schmitt**                                              8/29/2017, 12:08 PM
> Eventually I want to get paid for this.
>
> **UM**   **Unknown Party@Native Messages**                            8/29/2017, 12:08 PM
> That's the goal
>
> **MS**   **Max Schmitt**                                              8/29/2017, 12:08 PM
> I know I know.

11.      More broadly, all this misconduct demonstrates a pattern of deliberate, repeated misappropriation:  whenever they thought it would benefit them, Harry and Maxwell were perfectly happy abusing their positions and Vane's trust to benefit themselves and the competition.

12.      To be clear: this is all the tip of the iceberg.  Vane is continuing its investigation to determine whether Defendants may have misappropriated any additional trade secrets.  However, the facts known by Vane to date entitle it to appropriate injunctive and other relief against Defendants to prevent them from continuing to misuse Vane's trade secrets and to unfairly compete against Vane.  As such, this action seeks monetary damages and injunctive relief for violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq*. (the "DTSA"), the

Maryland Uniform Trade Secrets Act, Md. Cts. & Jud. Code §§ 11-1201, *et seq*. ("MUTSA"), and for common law breaches of contract and fiduciary duty, and for civil conspiracy.

## PARTIES

13.     Plaintiff Vane Line[2] is a limited liability company organized under the laws of the State of Maryland, with its principal place of business at 2100 Frankfurst Avenue, Baltimore, Maryland, 21226.   Vane Line provides petroleum transportation services which are used or intended to be used in interstate commerce.

14.     Plaintiff Vane Brothers is a corporation organized under the laws of the State of Maryland, with its principal place of business at 2100 Frankfurst Avenue, Baltimore, Maryland, 21226.  Vane Brothers provides launch services and sells and delivers fuels and lubricants which are used or intended to be used in interstate commerce.

15.     Upon information and belief, Defendant Harry Schmitt is a resident of Pennsylvania and resides at 421 E. Cherry Road Quakertown, Pennsylvania 18951, and was employed by Vane Brothers between on or about October 2010 and March 2017, and then again from October 26, 2018 until he was terminated on or about January 8, 2026.

16.     Harry's employment and the conduct at issue are substantively connected to Maryland.  Harry entered into an employment relationship with a Maryland-based company; performed portions of his job duties in Maryland, including work at the Baltimore office approximately 1 day a month; regularly interacted with colleagues and reported to supervisors based in the Baltimore office on a near daily basis; directed his work toward Maryland-based operations and customers, including work involving the Port of Baltimore; accessed trade secrets and proprietary information stored on Vane's proprietary servers located in Maryland; and

---

[2] On or about September 30, 2021, Vane Line Bunkering, Inc. was converted to a limited liability company, Vane Line Bunkering, LLC.

engaged in conduct giving rise to this dispute that was purposefully directed at and caused harm in Maryland to Maryland companies.

17.     Upon information and belief, Defendant Maxwell Schmitt was at all relevant times a resident of Maryland and currently resides at 117 Oakford Avenue, Edgewater, Maryland 21037, and was employed by Vane Line between on or about January 2013 and October 2017, and then again from October 26, 2018 until he resigned on or about December 30, 2025.

18.     Maxwell's employment and the conduct at issue are substantively connected to Maryland.  Maxwell entered into an employment relationship with a Maryland-based company; performed his job duties in Maryland, including working full-time from the Baltimore office and/or his home in Maryland from approximately December 2024 to December 2025; directed his work toward Maryland-based operations and customers, including work involving the Port of Baltimore; accessed trade secrets and proprietary systems stored on Vane servers located in Maryland; and engaged in conduct giving rise to this dispute that was purposefully directed at and caused harm in Maryland to Maryland companies.

19.     Upon information and belief, Defendant Barbarise is a resident of New Jersey and resides at 76 Locust Avenue, West Long Branch, New Jersey 07764.  He is the Co-Founder and Chief Executive Officer of the Ankora Entities.

20.     Upon information and belief, Defendant Ankora is a Delaware corporation with its headquarters located at 110 Norwood Avenue, Ste. B, Deal, New Jersey 07723.

21.     Upon information and belief, Defendant AMT is a Delaware corporation with its headquarters located at 110 Norwood Avenue, Ste. B, Deal, New Jersey 07723.

22.     Upon information and belief, Defendant AMH is a Delaware corporation with its headquarters located at 110 Norwood Avenue, Ste. B, Deal, New Jersey 07723.

8

**JURISDICTION AND VENUE**

23.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this matter pertains to a federal question relating to misappropriation of trade secrets under 18 U.S.C. §§ 1831, *et seq.*  This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the Maryland state law claims asserted herein.

24.     The Agreements governing Harry and Maxwell's employment with Vane provide, in pertinent part, that "The validity and construction of this Agreement or any of its terms or provisions shall be determined under the laws of the State of Maryland regardless of any principles of conflicts of laws or choice of laws of any jurisdiction. Any action to enforce this Agreement or relating to any claimed breach shall be instituted solely in the courts of the State of Maryland or, if applicable, the United States District Court for the District of Maryland."

25.     This Court has personal jurisdiction over Harry because he consented to personal jurisdiction in Maryland pursuant to his employment agreement with Vane (the "Harry Employment Agreement"), transacted or performed work and services in Maryland, and directed his wrongful actions to Vane, Maryland companies, including by accessing and misappropriating Vane's trade secrets, confidential information and proprietary systems that were stored on servers and systems located in Maryland.

26.     This Court has personal jurisdiction over Maxwell because he is a resident of Maryland, consented to personal jurisdiction in Maryland pursuant to his employment agreements with Vane (the "Maxwell Employment Agreements," and together with the Harry Employment Agreement, the "Agreements"), transacted or performed work and services in Maryland, committed most of his wrongful actions in Maryland, and directed those wrongful actions to Vane, Maryland companies, including by accessing and misappropriating Vane's trade secrets,

9

confidential information and proprietary systems that were stored on servers and systems located in Maryland.

27.     This Court has personal jurisdiction over Barbarise because, among other things, he maintained regular contact with Vane employees located in Baltimore, including Maxwell (and, when present in Baltimore, Harry), thereby directing suit related communications into Maryland; misappropriated Vane's trade secrets and confidential information that were stored on Vane's proprietary servers and systems located in Maryland; and entered into a conspiracy with Maryland-based employees (including Maxwell) the object of which included misappropriating Vane's trade secrets.

28.     This Court has personal jurisdiction over the Ankora Entities because, among other reasons, as co-founder and Chief Executive Officer, Barbarise's contacts described above are imputed to the Ankora Entities.  The Ankora Entities also transact substantial business in Maryland by contracting for maritime services that compete with Vane, and they purposefully directed their wrongful conduct at Vane, Maryland companies, including misappropriating Vane's trade secrets and confidential information that were stored on Vane's proprietary servers and systems located in Maryland.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as it is the judicial district in which a substantial part of the events and omissions giving rise to the claims asserted herein occurred.

## FACTUAL BACKGROUND

### A.     Vane is a Longtime Leader in Maritime Logistics and Transport.

30.     Founded in Baltimore, Maryland in 1898, Vane is a longstanding leader in the maritime transport and logistics industry.  Vane provides a wide range of services including ship bunkering (which involves delivering fuel to a ship for use in powering the ship); bulk transfer

10

(which involves moving fuel products between terminals); and the delivery of marine lubricants, stores, and non-potable water.  Today, the company owns and operates a fleet of approximately 50 tugboats and 80 barges, each with a capacity ranging between 10,000 and 140,000 barrels.  Vane maintains operations in Baltimore, New York, Philadelphia, Norfolk, Jacksonville, Tampa Bay, Seattle, San Francisco, and Los Angeles and from these locations serves the East Coast, Gulf Coast, the Pacific Northwest, and parts of California.

31.    For over 125 years, Vane has prided itself on building long-term customer relationships by being a reliable and competitively priced marine transportation provider which provides a range of services to its clients, including traditional bunkering services as well as dock-to-dock transportation.  Since its beginnings as a Baltimore-based ship chandlery in 1898, Vane has been dedicated to quality and customer satisfaction. Though the primary business focus has evolved over the years to meet the demands of an ever-changing industry, Vane continues to set the standard of excellence with updated equipment, experienced crews, and a commitment to safety and the environment. Vane takes pride in its maritime legacy and has been able to grow while retaining the spirit of a small family business.

32.    Vane's customers primarily include major oil companies and commodity trading houses, which contract directly with Vane to transport and deliver oil products to end users.  Vane performs these services using barge vessels chartered on a time-charter, freight, or spot basis, delivering product either directly to other vessels or to shoreside terminals.

**B.    Vane Carefully Crafts and Maintains the Secrecy of Trade Secrets.**

33.    Vane has developed a significant array of confidential and proprietary information and systems relating to its business and customer portfolio.  These include confidential information about Vane's technology and operations; supplier, contractor, and customer identities and relationships (including customer lists including significant confidential information about each

11

customer, pricing strategies and formulas, order histories, inspection reports, load and delivery reports, customer bids and bid strategies, and other contractual terms); the specifics of Vane's charter agreements; business opportunities and strategies; internal analyses of industry trends; operational procedures, methods, standards, policies, manuals, tools, and training materials; and business and marketing internal strategies (collectively, the "Vane Trade Secrets").

34.    Vane devotes significant resources, manpower, and funding into creating and developing the Vane Trade Secrets.

35.    The Vane Trade Secrets have significant value to Vane, and are generally not known in the marketplace.  Vane derives a significant economic benefit by virtue of this information being kept secret.

36.    The Vane Trade Secrets are primarily stored on company-controlled servers located in Baltimore, Maryland, which are synchronized in real time to a secure secondary server located in Philadelphia, Pennsylvania.  Additional Vane Trade Secrets, including customer contracts and policy and training documents, are maintained on Vane's Microsoft SharePoint cloud drive, which is accessible only to Vane employees through Vane-authorized devices.

37.    Vane maintains the Vane Trade Secrets in several secure locations.

38.    One such location is in Vane's proprietary logistics and dispatching platform known as Scheduling and Integrated Logistics ("SAIL").  First implemented in approximately 2007 and continuously refined over nearly two decades, SAIL functions as the central operating system for Vane's marine transportation and bunkering business.  SAIL contains comprehensive historical and real-time data concerning Vane's customers, contracts, pricing, logistics, and operations.  It serves as the logistical hub connecting dispatching, scheduling, vessel operations, communications with ship agents, customer coordination, billing, and port-specific operational

requirements, integrating hundreds of decision points required to safely and efficiently execute each job.

39.     SAIL continuously aggregates, stores, and analyzes large volumes of operational data generated 365 days a year, including job histories, vessel movements, arrival and departure times, tidal and port-rule data, discharge and transit durations, customer requirements, and internal communications related to each job.  All scheduling flows through SAIL: jobs are entered by Vane employees, by customers through a secure customer portal, or via integrated third-party systems, after which logistics coordinators use SAIL to plan, sequence, and execute deliveries, document communications, and attach supporting records.

40.     Using the SAIL system, Vane employees can look up confidential information concerning Vane customers and operations.  Such information includes among other things, customer names and contact information, details regarding all active and historical jobs (such as barge timing, products, and quantities delivered), communication logs, and a wide range of customer-specific documents, including ullage reports, delivery receipts, and load plans.

41.     Over time, SAIL has become, and continues to become, increasingly valuable to Vane by enabling it to mine nearly twenty years of accumulated data, and thus helping Vane predict transit times and load and discharge durations, avoid costly delays such as demurrage, and deploy vessels more efficiently than its competitors.  This compilation of historical data, operational rules, workflows, and applied expertise is not publicly available, cannot be readily replicated, and derives independent economic value from its confidentiality.

42.     Access to SAIL is strictly controlled through Vane's internal network and user-permission structure.  Only authorized employees assigned to specific SAIL user groups may access the system, and access levels are tiered based on job responsibilities.

43.     SAIL access ranges from limited "read-only" permissions to "super user" privileges that permit full visibility into and control over sensitive business information, including customer contracts, pricing, charges, terminals, and operational rules.  Access is granted only through company-issued user accounts on company-controlled devices, and SAIL cannot be accessed from personal devices such as mobile phones.  Vane restricts SAIL access to ensure that employees may view or modify only the information necessary to perform their job functions, thereby safeguarding the confidentiality and security of the information stored in the system.

44.     The SAIL system costs Vane hundreds of thousands of dollars per year to maintain and has taken 20+ years' worth of human capital and industry knowledge to populate.

45.     Another system where Vane Trade Secrets are maintained is Rate Maker.  Rate Maker is a Vane-built pricing tool housed on company-controlled systems and used primarily to generate spot-market pricing for marine transportation and bunkering services. Authorized personnel can use Rate Maker to input a set of variables, including, among other things, mileage, ports, and cargo being transported, after which the system applies Vane's proprietary pricing logic to generate a rate.  This pricing methodology reflects Vane's accumulated experience, historical data, and internal business judgment and is not disclosed outside the company.

46.     Rate Maker also contains a comprehensive contract-management component, including a Gantt-style[3] visualization that reflects Vane's charter portfolio, contract terms, and applicable rates over time (the "Contract Gantt").  This functionality allows users to view, compare, and evaluate active and historical contracts and pricing structures in a consolidated format, enabling informed pricing decisions for spot work and efficient deployment of vessels.

---

[3] A Gantt chart displays activities along a horizontal timeline.  In this context, the Gantt-style visualization presents charter contracts and applicable rates across defined time periods, allowing users to view concurrent contracts, upcoming expirations, and pricing changes over time in a single, consolidated graphic format.

14

Similar to SAIL, access to Rate Maker is strictly controlled through Vane's internal network and user-permission structure, and only authorized employees assigned to specific user groups may access the system, and access levels are tiered based on job responsibilities.

47.    The pricing logic, contract data, and analytical tools embedded in Rate Maker derive independent economic value from not being generally known and provide a substantial competitive advantage, particularly in the spot market, where competitors such as the Ankora Entities compete directly with Vane and could use this information to undercut pricing, anticipate bids, or replicate Vane's rate-setting strategy.

48.    Finally, Vane also developed and maintains a proprietary internal platform known as "vTracker."  vTracker is an in-house vessel tracking system that aggregates and organizes operational information critical to the execution of marine transportation and bunkering services. vTracker contains detailed information regarding Vane and non-Vane vessels, including their historical paths, and specific terminals, docks, piers, and ports, including terminal-specific requirements and operational constraints that are not available in any single public source. Accordingly, vTracker's value derives from the unique compilation, curation, and integration of that information with non-public operational data developed through Vane's experience and internal processes.  The resulting compilation could not be readily assembled by a competitor without substantial time, effort, and expense.

49.    Access to vTracker is restricted and subject to the same security and access-control framework governing Vane's other proprietary systems.  vTracker is accessible to Vane employees only through Company-controlled devices and network credentials, and any limited mobile access is subject to additional security controls designed to prevent data leaks, including restrictions that block screenshots or unauthorized copying of information.  Additionally, Vane customers are

15

provided network credentials permitting them to view only their own jobs in vTracker. Through

these measures, Vane maintains the confidentiality of the compiled information within vTracker,

which derives independent economic value from not being generally known and provides a

material competitive advantage in the marine transportation and bunkering market.

    **C.**    **Vane's Confidentiality Policies and Provisions Are Designed to Protect the Vane Trade Secrets.**

50.    Vane takes many steps to protect its confidential information and the Vane Trade

Secrets.

51.    Vane issues Employee Handbook policies to their employees that requires them to

keep Vane's confidential information and the Vane Trade Secrets confidential.  The Employee

Handbook specifically prohibits revealing confidential information to outsiders or misusing

confidential information.

52.    Specifically, the Employee Handbook provides:

**7.4 Confidentiality and Non-solicitation of Employees**

During the course of employment at Vane, employees may learn, create, or be exposed to confidential, proprietary and trade secret information. Such information is the exclusive property of Vane and, with the exceptions of using such information to perform proper work or if express authorization is obtained from Vane, employees may not use, reproduce or disclose at any time, during or after employment, any confidential information relating in any way to Vane's business, policies, or procedures.

Confidential information may be written, oral, by demonstration, electronic, or by any other medium and includes, but is not limited to: (1) information relating to technology and research development activities; (2) the identity of the suppliers and contractors and the terms of the relationships with such suppliers and contractors, including price information; (3) the identity and the terms of the relationships with former, current and potential customers, clients or contacts; (4) the procedures, methods, standards, specifications, concepts, policies, tools, and techniques of or relating to Vane's operations; (5) information or manuals relating to recruitment, design, training, strategy, policy and procedure; (6) business opportunities, business plans, marketing information and business strategies; (7) earnings and other financial data; and (8) information contained in Vane's personnel files

affecting the individual privacy rights of Vane employees, partners, officers, directors, agents, or consultants may also be protected from public disclosure, in accordance with applicable law. In addition, all correspondence, writings, computer records and other documents, including all copies, which come into an employee's possession in the course of employment, regardless of the source and whether or not created by the employee, are the sole and exclusive property of Vane.

Disclosure of any confidential information listed above is a form of dishonesty that may result in, at Vane's sole discretion, discipline, up to and including termination, as well as appropriate legal action. Employees must recognize that this information has significant commercial value to the employer. Unauthorized disclosure of any confidential information, material or services would irreparably damage Vane.

Vane prohibits employees from divulging to other firms, persons or corporations during their term of employment or at any time thereafter, confidential information or material directly or indirectly referred to in this Section. Employees must also maintain the confidentiality of information concerning Vane's financial status. Immediately upon the termination of employment for any reason, or when otherwise requested by Vane, employees are required to return to Vane all such documents, information and other property.

Also, for a period of 18 months from the date that the employee is no longer employed by Vane, the employee shall not take any actions to assist the Employee's successor employer or any other entity in recruiting any other employee who works for or is affiliated with Vane. This includes, but is not limited to (a) identifying to such successor employer or its agents or such other entity the person or persons who have special knowledge concerning Vane's processes, methods or confidential affairs; and (b) commenting to the successor employer or its agents or such other entity about the quality of work, . . . special knowledge, or personal characteristics of any person who is still employed at Vane. The employee also agrees that they will not provide such information set forth in (a) and (b) above to a prospective employee during interviews preceding possible employment.

Nothing in this policy shall be deemed to interfere with employee disclosure rights protected by law. If you are not sure about whether particular information is subject to this confidentiality duty, refer inquiries to your Supervisor.

53.     All employees, including Harry and Maxwell, are provided a copy of the Employee Handbook and are required to sign an "Acknowledgement of Receipt" acknowledging that they have received it and understand the contents thereof.  The Schmitts did so.

54.     Both Harry and Maxwell's Agreements also contain additional terms regarding confidentiality further requiring them to keep confidential and not disseminate any of Vane's confidential information and the Vane Trade Secrets, described in detail below.

55.     Vane further issues an Information Technology Use Policy to their employees that governs access to and use of company systems, and includes restrictions on unauthorized access, prohibitions on credential sharing, limits on remote access and cloud storage, monitoring and auditing of system use, and disciplinary consequences for violations.

56.     All employees, including Harry and Maxwell, are provided a copy of the Information Technology Use Policy and are required to sign an "Acknowledgement of Receipt" acknowledging that they have received it and understand the contents thereof.  The Schmitts did so.

### D.     Harry's Employment at Vane.

57.     Vane hired Harry in its bunkering division in or around October 2010 as a Fleet Coordinator, where he was responsible for managing the logistics and schedules for a fleet of over 700 crew on over 100 vessels.  Harry was later promoted to Vessel Supervisor in or around March 27, 2013, with responsibilities including monitoring vessel compliance, attending vessel inspections, and overseeing equipment servicing.

58.     In or around March 2017, Harry temporarily left Vane to work for a competitor, Harley Marine, where, upon information and belief, he served as an East Coast Sales and Marketing Manager.

59.     On or around October 26, 2018, Vane rehired Harry as a Chartering and Scheduling Manager.  In that role, his responsibilities included overseeing bulk transfer operations,

18

scheduling, logistics, communication, and billing for the company's bulk deliveries.  Upon being

rehired, Harry entered into the Harry Employment Agreement with Vane,[4] dated October 26, 2018.

60.    Following a reorganization in or around November 2024, Vane's bulk and bunker

teams, which had previously operated as a single group, were separated into the Bunker Group,

responsible for bunkering operations, and the Bulk Transfer Group, which manages terminal-to-

terminal transport operations.  As a result of this reorganization, Harry became a Chartering and

Scheduling Manager for the Bulk Transfer Group, where his responsibilities included managing a

team of schedulers and overseeing logistics for Vane's bulk fleet.

61.    From approximately late-September 2023 to October 2025, Harry also performed

dispatching duties on weekends.

62.    The Harry Employment Agreement contains employment and post-employment

non-competition, non-solicitation and confidentiality clauses.

63.    Regarding unlawful competition and solicitation, the Harry Employment

Agreement states as follows:

> Non-Competition. During your employment and for twelve (12) months
> thereafter (the "Restricted Period"), whether your employment ended
> voluntarily, involuntarily, or as the result of the termination of this
> Agreement, you agree not to, individually or as an officer, director,
> employee, stockholder or consultant of any other Person wherever located,
> directly or indirectly, provide services similar to those you provided to Vane
> for a Competitor (defined above).
>
> Non-Solicitation. During the Restricted Period, you agree not to,
> individually or as an officer, director, employee, stockholder or consultant
> of any other Person wherever located, solicit or induce (or attempt to solicit
> or induce): (1) any client of Vane with which you worked or had contact
> with in your last 12 months of employment with Vane to cease or reduce its

---

[4] Although the Harry Employment Agreement and one of the Maxwell Employment Agreements identify the employer as "Vane Brothers Company," that reference is a scrivener's error.  At all relevant times, including at the time of their termination, Harry and Maxwell were employed by Vane Line, which directed and controlled their day-to-day work and paid their compensation. The Vane Brothers Company is nevertheless named in this Complaint out of an abundance of caution because it is listed as the contracting party in these agreements.

business with Vane; and (2) any employee of Vane to leave his/her employment with Vane or consider or accept employment with any other Person.

64.     "Competitor" is defined as "any Person engaged in the [business or substantially same business of Vane; namely, maritime work related to the delivery of petroleum products by tug and barge throughout the territorial waters and ports of the United States and its States] within an area within the territorial waters and ports of the United States."

65.     The Harry Employment Agreement's confidentiality clause states as follows:

Non-Disclosure of Confidential Information.

(i) You acknowledge that Vane's business interests require a confidential relationship between you and Vane and the fullest practical protection and confidential treatment of all "Trade Secrets or Confidential or Proprietary Information" (as defined above). Accordingly, you agree to keep confidential and not to disclose to anyone, directly or indirectly, or otherwise "Misappropriate" (as defined above) any Trade Secrets or Confidential or Proprietary Information at any time. "Anyone" in the preceding sentence does not include Vane or any "Persons" (as defined above) designated by Vane to receive such information. Your obligations hereunder will continue both during and after the initial and any successive term of this Agreement for so long as such Trade Secrets or Confidential or Proprietary Information remain Trade Secrets or Confidential or Proprietary Information of Vane.

(ii) You acknowledge and agree that:

(1) All Trade Secrets or Confidential or Proprietary Information shall be "Trade Secrets" (as defined above) of Vane;

(2) You occupy a unique position within Vane as a result of your position as with Vane; and

(3) In the event you breach Section 4(b) hereof with respect to any Trade Secrets or Confidential or Proprietary Information, such breach will be deemed to be a Misappropriation of such Trade Secrets or Confidential or Proprietary Information.

(iii) Upon termination of your employment with Vane or at any other time upon Vane's request, you further agree to surrender to Vane all documents, writings, lists, notes, business, marketing or strategic plans, financial information, member, distributor and supplier lists, programs, manuals,

illustrations, models, and other such materials produced by you or coming into your possession by or through employment with Vane and agree that all such materials are at all times Vane's property.

66. "Trade Secrets or Confidential or Proprietary Information" are defined as:

[A]ny and all proprietary information, trade secrets, know-how, techniques, processes, data, plans, concepts, programs, codes, procedures, innovations, inventions, improvements, costs, prices, rates, earnings, products, systems, sources of supply, active and prospective customers, clients and members, and marketing, budgets, business plans, business arrangements, and other information, whether in written, oral, electronic or other form: (1) That derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and (2) Is the subject of reasonable efforts to maintain its secrecy.

67. "Misappropriate" is defined per the meaning set forth in Md. Code Ann., Comm. Law § 11-1201, which provides that:

"Misappropriation" means the:
(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
    (i) Used improper means to acquire knowledge of the trade secret; or
    (ii) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
        1. Derived from or through a person who had utilized improper means to acquire it;
        2. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
        3. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
    (iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

68. "Persons" is defined as "a natural person, corporation, estate, trust, partnership, association, joint venture, government, governmental agency or subdivision, or any other legal or commercial entity."

69.     As Chartering and Scheduling Manager, Harry had full access to the Vane Trade Secrets, including, but not limited to, access to SAIL as a "super user," access to Rate Maker and vTracker, as well as access to Vane's customer and vendor information.  Vane would not have provided Harry with such access had he not agreed on multiple occasions to keep Vane's confidential and proprietary information and trade secrets confidential.

**E.     Maxwell's Employment at Vane.**

70.     Vane hired Maxwell in or around January 2013 as a Scheduler and Dispatcher, where he was responsible for dispatching vessels for bunker and bulk deliveries.

71.     In or around October 2017, Maxwell temporarily left Vane to work for a competitor, Harley Marine where, upon information and belief, he served as a Scheduler/Customer Relations Manager.

72.     On or around October 26, 2018, Vane rehired Maxwell as a Team Lead of Bunker Chartering and Scheduling.  In connection with his rehiring, Maxwell entered into an employment agreement with Vane (the "2018 Maxwell Employment Agreement"), dated October 26, 2018.  In that role, his responsibilities included day-to-day management of bunker deliveries in the Port of New York.

73.     In or around November 2024, in connection with Vane's efforts to have remote employees return to the office, Maxwell relocated to Baltimore and worked full-time from Vane's Baltimore office.  In order to assist Maxwell with this transition, Vane paid for his family's relocation expenses and reimbursed Maxwell for 12 months of rent.

74.     In October 2025, Maxwell was promoted to Director of Fleet Logistics.  As Director of Fleet Logistics, his responsibilities grew to include the management of Vane's bulk transfer group as well as bunkering and towing operations in the New York Harbor.  In connection with

his promotion, Maxwell entered into a new employment agreement with Vane (the "2025 Maxwell Employment Agreement"), dated October 1, 2025.

75.    The 2018 and 2025 Maxwell Employment Agreements contain employment and post-employment non-competition, non-solicitation and confidentiality clauses that are materially identical to those in the Harry Employment Agreement.

76.    As a Manager and as Director of Fleet Logistics, Maxwell had full access to the Vane Trade Secrets, including, but not limited to, access to SAIL as a "super user," access to Rate Maker and vTracker, as well as access to Vane's customer and vendor information.  Vane would not have provided Maxwell with such access had he not agreed on multiple occasions to keep Vane's confidential and proprietary information and trade secrets confidential.

**F.    Barbarise Leaves His Former Employer and Forms the Ankora Entities.**

77.    Upon information and belief, from approximately March 2013 to May 2023, Barbarise was employed by Plaza Marine, Inc. ("Plaza Marine") as its Vice President of Sales and Trading.  Plaza Marine actively purchases, sells, and delivers distillate fuels and other marine products for sale, primarily to ocean-going vessels.

78.    At all relevant times, Plaza Marine was a customer of Vane. Upon information and belief, Barbarise was directly involved in negotiating and managing Plaza Marine's commercial relationship with Vane, including contracts negotiated with Harry on Vane's behalf.

79.    Upon information and belief, in or around May 2023, Barbarise gave notice of his resignation from Plaza Marine and thereafter separated from the company.

80.    Upon information and belief, following the end of his employment with Plaza Marine, Barbarise was subject to a one-year non-competition obligation arising from his employment agreement with Plaza Marine.

81.    Subsequently, Barbarise partnered with other third-party individuals to organize and start the Ankora Entities.

82.    On March 1, 2024, Ankora was formed as a Delaware limited liability company.

83.    On March 27, 2024, Ankora registered to do business in Maryland.

84.    According to its website,[5] Ankora is engaged in the business of purchasing, selling, and delivering marine distillate fuels to vessels, and supplies in many of the same locations served by Vane, including the New York Harbor, Baltimore, Norfolk, Philadelphia, South Jersey, and Delaware.

85.    On February 14, 2025, AMT was formed as a Delaware limited liability company.

86.    According to its website,[6] AMT serves the New York harbor region by providing petroleum transportation services in an identical manner as Vane.

87.    On or about July 3, 2024, the Ankora Entities made their first bunker delivery.[7] Upon information and belief, during this time, the Ankora Entities chartered two barges, each with a capacity of 9,000 to 10,000 barrels, and two tugs, from American Petroleum & Transport ("American Petroleum") to provide transport services.  One tug and barge are primarily utilized for dock-to-dock and terminal-to-terminal barge movements in the New York Harbor region (primarily diesel and biodiesel), while the other tug and barge are primarily engaged in harbor bunkering operations.

88.    Between July 2024 and March 2025, Ankora contracted with Vane for approximately five bunker jobs.

---

[5] Ankora Fuels, https://www.ankorafuels.com/ (last visited March 21, 2026).
[6] Ankora Marine Transport, https://www.ankoramarine.com/ (last visited March 21, 2026).
[7] Ship & Bunker News Team, *New US Supplier Ankora Fuels Completes First Bunker Delivery*, Ship & Bunker (July 11, 2024), https://shipandbunker.com/news/am/228690-new-us-supplier-ankora-fuels-completes-first-bunker-delivery.

89.    Upon information and belief, in or around May 2025, the Ankora Entities purchased the two barges and two tugs from American Petroleum.  Once the Ankora Entities purchased the two barges and two tugs from American Petroleum, they became direct competitors with Vane in the marine fuel delivery market.

90.    Upon information and belief, Barbarise serves as one of the Ankora Entities' key principals and decisionmakers.  Barbarise also performs chartering, logistics, and operational functions for the Ankora Entities.  Barbarise provides services to the Ankora Entities that are competitive to Vane.

91.    Upon information and belief, while Harry and Maxwell were still employed by Vane, Barbarise, acting individually and on behalf of the Ankora Entities, worked with Harry and Maxwell to misappropriate Vane's confidential and proprietary information and the Vane Trade Secrets in order to assist the Ankora Entities in preparing for and developing its competing marine fuel delivery business and to enable the Ankora Entities to compete unfairly with Vane.

92.    On or about August 23, 2024 and August 26, 2024, the Ankora Entities and Barbarise were sued by Barbarise's former employer, Plaza Marine, for, among other things, breach of contract and fiduciary duty, misappropriation of trade secrets, and tortious interference in the cases entitled *Plaza Marine, Inc. v. Ankora Fuels, LLC, et al.*, No. 3:24-cv-08728 (N.J.D.C.) and *Plaza Marine, Inc. v. Barbarise, III*, Index No. 615150/2024 (Sup. Ct. Nassau Cnty.).[8]

### G.    Harry and Maxwell Leave Vane.

93.    In late September 2025, Harry abruptly refused to continue performing weekend scheduling and dispatching duties for Vane and declined to assist his team in identifying coverage

---

[8] *Plaza Marine alleges Ankora used company secrets*, Argus Media (June 9, 2024), https://www.argusmedia.com/en/news-and-insights/latest-market-news/2605791-plaza-marine-alleges-ankora-used-company-secrets.

solutions for weekend dispatch needs.  He also informed Vane that he was not interested in pursuing other expanded roles that had been suggested, and intended to remain in his position as Manager of the Bulk Transfer Group.

94.    Also in October 2025, around the same time Maxwell was promoted to Director of Fleet Logistics, another Vane employee was promoted from Special Projects Manager to Vice President of Fleet Logistics.  Following this promotion, that employee—who previously was less senior than Maxwell—became Maxwell's direct supervisor.

95.    After that promotion, Maxwell expressed dissatisfaction that a less senior employee had been promoted to the Vice President position, including directly to his new supervisor.  In response, Vane emphasized to Maxwell that it remained committed to investing in his future: when Maxwell relocated to Baltimore less than one year prior, the company paid for his family's relocation expenses to move from Pennsylvania to Baltimore and reimbursed Maxwell for 12 months of rent.  In addition, Maxwell's October 2025 promotion included a 16.13% pay increase as well as a $19,375 bonus which he received on December 5, 2025.  Around this same time, Vane was also in discussions with Harry about relocating him to Baltimore under similar conditions that had been offered to his brother.  Despite the company's efforts to develop the brothers' skills and expertise, both Maxwell and Harry began voicing to their co-workers increasing dissatisfaction with Vane generally.

96.    During the first week of December 2025, on short notice to Vane, Maxwell took a week of vacation.

97.    The following week, after reporting to the office on Monday and Tuesday, Maxwell worked from home for the remainder of the week—an unusual arrangement for Maxwell, who typically worked from the office five days a week.

98.     On or about Sunday, December 14, 2025, Maxwell notified his new direct supervisor, the Vice President of Fleet Logistics, that he would not be coming into work that week due to undisclosed personal reasons.

99.     On Wednesday, December 17, 2025, Maxwell provided notice that he could not work for the remainder of the week without providing an explanation.

100.    On December 26, 2025, Maxwell gave his notice of resignation to Vane and offered to continue working for the ensuing two-week period.

101.    On December 30, 2025, Vane accepted Maxwell's resignation and informed him that December 30, 2025 would be his last day.

102.    On December 30, 2025, for the reasons explained herein, Vane suspended Harry's employment pending further review.  At that time, Vane confiscated Harry's work-issued phone and computer.

103.    On the same day, Vane requested that Maxwell turn over his work-issued phone and computer.  Maxwell told Vane management that he didn't have the devices with him (even though he was in the office that day and had offered to continue working for two weeks after he submitted his resignation) and needed to go to his home to retrieve them.  The absence of both devices, each of which was essential to the performance of Maxwell's job duties, was inconsistent with his normal course of conduct and raised significant concerns for Vane.  Immediately before Maxwell returned the phone, he intentionally permanently erased all information from his work-issued phone.  Upon information and belief, Maxwell intentionally erased text messages from the phone that were between him and Barbarise and him and Harry.  Upon further information and belief, the device wipe was also intended to remove photographs or videos stored on the phone— including potential images of SAIL, vTracker, customer contracts, terminal and berth information,

27

or other proprietary Company data—consistent with Maxwell's prior use of his phone to capture and transmit company-related photographs and videos, as discussed below.

104.    On January 8, 2026, Vane terminated Harry's employment.

**H.     Vane Discovers Defendants' Misappropriation of the Vane Trade Secrets.**

105.    In or around October 2025, in the wake of the brothers' conduct following a less senior employee becoming Maxwell's supervisor and Harry's abrupt refusal to continue weekend scheduling and dispatching for Vane, Vane became concerned that Harry and Maxwell were misusing company time and resources.  Accordingly, Vane began monitoring the Schmitts' activity on their work-issued computers.  After Vane later suspended Harry, Vane also confiscated and conducted a forensic examination of his work-issued phone.

106.    The results were stunning.

107.    Vane's investigation uncovered not only that the brothers were misappropriating Vane's Trade Secrets and other confidential information in collusion with Barbarise and the Ankora Entities, but also evidence of similar misconduct when the brothers departed Vane to work for Harley Marine during 2017 and 2018.

### i.  *Misappropriation of Vane Trade Secrets in Connection with Harley Marine.*

108.    Vane's investigation has uncovered that, while employed by Harley Marine in 2017 and 2018, Harry and Maxwell used Vane's confidential information to assist Harley Marine in competing against Vane, and did so to Vane's detriment.

109.    At all relevant times, Harley Marine was a marine petroleum transportation operator that provided services substantially similar to those offered by Vane and was a direct competitor of Vane.

110. Between March and October 2017, while Harry was employed by Harley Marine and Maxwell remained employed by Vane, Maxwell transmitted a substantial volume of Vane Trade Secrets to Harry, including confidential customer information obtained from Vane's proprietary SAIL system. Communications between the brothers during this period show that Harry used this information for the benefit of Harley Marine and to compete directly with Vane. Those communications further show that Maxwell was aware of, and intended, Harry's use of the information for that purpose, and that both brothers understood they were wrongfully taking and transmitting Vane's confidential information.

111. Specifically, based on the data presently available to Vane from its review of Harry's work-issued phone, Vane has identified the following, while discovery is expected to reveal additional instances of misconduct and misappropriation.

112. Beginning as early as April 2017, shortly after Harry left Vane to work for its direct competitor, Harley Marine, Harry began soliciting confidential Vane information from his brother Maxwell, who remained employed by Vane in a position of trust and had access to Vane's proprietary SAIL system. Maxwell repeatedly provided that information, despite knowing it belonged to Vane and was being used to assist a competitor. For example, on multiple occasions, Harry sought, and Maxwell provided, detailed, non-public information about Vane customers, including in advance of meetings Harry was conducting on behalf of Harley Marine:

     a. On April 3, 2017, Harry informed Maxwell via text that he had an upcoming meeting with representatives of a Vane customer. In response, Maxwell sent Harry detailed information about the customer, including personnel roles and responsibilities, typical fuel volumes supplied, load and delivery locations, and the identities of key personnel involved in handling those vessels.

29

b.      The following day, on April 4, 2017, Harry sent Maxwell a text message asking for any information about a Vane customer that Harry could "give these guys"—which, on information and belief, referred to Harley Marine—before Harley Marine "officially start doing work for them." Maxwell responded that the information was "[t]oo long to text out" and asked to discuss by phone that evening.

c.      On April 9, 2017, Harry again told Maxwell that he had meetings scheduled the next day with two Vane customers, and instructed Maxwell to "start getting info together."

113.   Over time the brothers openly acknowledged, yet continued, their improper conduct. For example:

a.      On April 12, 2017, Harry sent Maxwell a text message requesting the "background/rundown" on one Vane customer, and later that same day asked for information on another. In those messages, Harry told Maxwell that Vane's then Chief Operating Officer would "rue the day he let me walk," and boasted that he could "basically take anyone I want if I had the equipment."

b.      On April 13, 2017, Harry sent Maxwell a text message asking for job-volume data for a Vane customer. Maxwell responded that he was worried he was going to "get . . . sued," but nevertheless provided Harry with the requested information regarding the Vane customer. Harry replied by acknowledging the concern, stating, "Alright, no more. Sorry!"

114.   That acknowledgement of wrongdoing did not stop the misconduct. Instead, the brothers persisted in their misappropriation. By late April 2017, the brothers' communications reflected a quid pro quo: Maxwell provided confidential Vane information to help Harry perform

30

his role at Harley Marine, and Harry, in turn, would do what he could to bring Maxwell to Harley Marine.  For example:

   a.   On April 25, 2017, Maxwell sent Harry a text message asking whether his "email help[ed] at all," explaining that he "figured maybe NY bunkers may come up tomorrow."  Harry responded that the information was "[p]erfect."  On information and belief, Maxwell's email provided Harry with confidential Vane customer information regarding Vane's NY Bunker operations and customers, which Maxwell intended to assist Harry in performing work for Harley Marine.

   b.   The following day, on April 26, 2017, Harry asked Maxwell whether he felt like providing similar information for another Vane customer.  Maxwell responded affirmatively, and later confirmed that the information was "[s]ent."  A short time later, Harry replied stating that he had "actually asked about bringing you on with Harley today."

115.   Text messages further reflect that Harry sought to solicit Vane employees to join Harley Marine as a means of harming Vane.  In a May 2017 exchange with Harley Marine's Matt Godden ("Godden"), Harry stated that, if "[y]ou really want to hurt Vane," Harley Marine should hire specific Vane employees.  Godden responded, "One way or another we're going to punish Vane," to which Harry replied that taking one of Vane's customers would be "a good way to punish Vane."

116.   Throughout 2017, the brothers continued to misappropriate Vane's confidential information, during which Maxwell told Harry that he wanted to "get paid" for sharing that information.  The brothers further took steps to conceal Maxwell's involvement, including by using their father's computer to avoid detection.  For example:

31

a.      On June 22, 2017, at Harry's request, Maxwell again provided Harry with detailed confidential information regarding a Vane customer's bunkering operations, including typical load and delivery ports, vessel types, average job sizes, products supplied, multi-product loading practices, and blending operations in New York and Philadelphia.

b.      On August 16, 2017, Harry and Maxwell exchanged text messages concerning the terms of a potential job for Maxwell at Harley Marine. Harry then told Maxwell that he had spoken with Harley Marine about "revamping their dispatching system," and instructed Maxwell that he "***need[ed] to take pictures of SAIL and all the tabs.***" Maxwell responded, "Dear lord," after which Harry directed him to take photographs from their father's computer at home (their father was a Vane employee at the time). Maxwell replied, "Perfect," and added that he was "[t]hinking like a true villain."

c.      On August 29, 2017, after providing Harry with information about a Vane customer, Maxwell texted Harry, "Eventually I want to get paid for this," to which Harry responded, "That's the goal." On information and belief, this exchange reflected their shared understanding that Maxwell's disclosures of Vane's confidential information were being made for their personal benefit, rather than for any legitimate business purpose.

d.      On September 2, 2017, Harry texted Maxwell that he was "[g]oing to have to take pictures of SAIL at some point," to which Maxwell responded, "For sure."

32

e.      On September 29, 2017, Harry and Godden discussed recruiting Maxwell and other Vane employees to join Harley Marine, and discussed Maxwell's current compensation at Vane.

f.      On October 19, 2017, consistent with those plans, Maxwell sent Harry nine screenshots containing confidential information from Vane's proprietary SAIL system, including details regarding active bunkering jobs for a Vane customer, including timing, product, and quantities.  Maxwell also sent Harry a two-and-a-half-minute video recording of himself scrolling through information within the SAIL system.

117.    In October 2017, Maxwell left Vane and joined Harley Marine.

118.    After Maxwell joined Harley Marine, Harry continued his efforts to solicit additional Vane employees to join him.  For example, in January 2018, Harry informed Godden that a Vane employee had given notice, prompting Godden to respond that it was a "late Christmas present" for him.  Later that month, Harry and Godden discussed recruiting Vane's New York Port Captain and coordinating outreach to other Vane personnel. In that exchange, Godden referred to the recruitment effort as "the final headshot" to Vane, to which Harry responded that he "love[d] that play," reflecting a coordinated strategy to target and poach key Vane employees.

119.    On or about October 26, 2018, Harry and Maxwell were rehired by Vane.  None of the above activity was known by Vane at the time.

120.    Through the foregoing conduct known to date, and on information and belief additional conduct to be identified after further investigation and discovery, Harry and Maxwell misappropriated the Vane Trade Secrets and other confidential and proprietary information for their benefit and that of Harley Marine.

121.    The brothers' acquisition, disclosure, and use of the Vane Trade Secrets were undertaken without Vane's authorization and through improper means, including the unauthorized access to and disclosure of non-public information obtained through their positions of trust at Vane.

122.    Upon information and belief, Harry and Maxwell obtained, disclosed, and used the Vane Trade Secrets not for any legitimate business purpose of Vane, but for their own benefit and for the benefit of Harley Marine.

123.    Upon information and belief, Harry had knowledge of, condoned, participated in, and encouraged the unlawful access to the Vane Trade Secrets and confidential information as described herein.

124.    As a result of Harry and Maxwell's actions, Harley Marine was able to unfairly compete with Vane, including by soliciting work away from Vane's longstanding customer relationships for the wrongful benefit of Harry, Maxwell, and Harley Marine and to the detriment of Vane.  Their  wrongful actions have caused, and continue to cause, Vane significant damages and irreparable harm, including lost profits, legal fees and other costs and expenses.

### ii.    *Misappropriation of Vane Trade Secrets in Connection with Barbarise and the Ankora Entities.*

125.    Vane's investigation has uncovered that, during their employment with Vane, Harry and Maxwell cultivated a covert relationship with Barbarise while serving in positions of trust at Vane and while maintaining access to Vane's most sensitive confidential information.

126.    While employed by Vane, Harry and Maxwell not only misappropriated Vane's confidential information and the Vane Trade Secrets and shared that information with Barbarise to enable the Ankora Entities to prepare for and compete directly with Vane, including for

34

bunkering work in New York Harbor, but also that both brothers actively performed services for Ankora in direct competition with Vane while remaining employed by the company.

127. For example, analysis of Harry's and Maxwell's phone records from their work-issued phones and computer activity reveals that both brothers used their work phones on numerous occasions to call Barbarise while simultaneously accessing Vane's proprietary SAIL system and viewing confidential customer and operational information, including detailed job information concerning ship and barge timing, products, testing requirements, supplier details, billing information, loading information, and quantities being delivered.

128. Specifically, between June 2023 (shortly after Barbarise left Plaza Marine) and December 26, 2025, Harry exchanged at least 1,022 calls with Barbarise, while Maxwell exchanged at least 354 calls with Barbarise between July 2024 and December 26, 2025. These calls took place on Harry and Maxwell's work-issued phones, primarily during workdays, with the vast majority of calls occurring during standard business hours (Monday to Friday, 8:30 a.m. to 5:00 p.m.). Additionally, many of these calls—at least 474 for Harry and 255 for Maxwell—took place between April 2025 and December 26, 2025, a period during which Vane had no ongoing business with the Ankora Entities.

**Fig. 1**

| Individual | Total Calls with Barbarise | Time Period Covered | Calls During No-Business Period (Apr. 2025 – Dec. 26, 2025) |
|---|---|---|---|
| Harry Schmitt | 1,022+ | June 2023 – Dec. 26, 2025 | 474+ |
| Maxwell Schmitt | 354+ | July 2024 – Dec. 26, 2025 | 255+ |

129. While Maxwell may have had a need to engage in limited communications with Barbarise to coordinate bunker deliveries as a Manager and as Director of Fleet Logistics, Harry had even fewer such reasons outside of the brief periods when he worked weekend New York bunkering shifts or occasionally covered shifts for that team. Regardless of the reason or frequency

of the communications with Barbarise, Vane's standard practice requires that any phone call, email, or other significant job-related communication be logged in the SAIL system.[9] Despite routinely accessing SAIL during these calls, Harry and Maxwell rarely, if ever, documented their communications with Barbarise, undermining any suggestion that these communications were for legitimate Vane business.

130. As another example, an examination of Harry's work-issued phone uncovered that Harry began discussing potential employment with Ankora as early as October 2024 and met with Barbarise at Ankora's offices in November 2024 to discuss the terms of such employment. Text messages exchanged between Harry and Barbarise from September 2023 through Harry's suspension in December 2025 further reflect frequent in-person meetings and lunches, Harry's provision of assistance relating to vessel activity, job details, and industry contacts, and Barbarise's provision of gifts and other benefits to Harry.

131. On information and belief, Harry and Barbarise used coded language in these communications to conceal their actions. These messages provide additional support for Vane's belief that Harry was performing work for Ankora while employed by Vane in exchange for compensation and/or other benefits.

132. Additionally, on more than one occasion, both brothers engaged in extensive phone communications with Barbarise and with each other that coincided with the movement and operation of Ankora's barges. These call records further support Vane's belief that the brothers

---

[9] On January 23, 2025, Maxwell sent an email to two of Vane's night-shift operators stressing the importance of such communication logs, stating "This email is being sent to stress the **utmost importance** of communication logs being entered into SAIL properly and timely. . . . It is **extremely important** that we log **every conversation** we have with all parties related to every job including customers, agents, terminals, surveyors (if relevant), tugs/barges (if relevant), and on call person (if relevant)."

were acting in coordination to provide services to Barbarise and the Ankora Entities while still employed by Vane.

133. Upon information and belief, beginning no later than mid-2025, Harry brought Maxwell into the scheme with Barbarise and the Ankora Entities. An examination of Harry's work-issued phone and Maxwell's call records reveal that in mid-2025, Maxwell began communicating with Barbarise outside the ordinary course of Vane's business, including participating in a golf outing with Harry, Barbarise, and Ankora employee Ross Grill in July 2025 that, on information and belief, was paid for by Barbarise and/or the Ankora Entities.

134. During this same period, Harry acknowledged internally that Ankora was a direct competitor of Vane, while nevertheless continuing his undisclosed communications and cooperation with Barbarise in coordination with Maxwell. An examination of both brothers' call logs further reveal a recurring pattern of calls among Harry, Maxwell, and Barbarise, including frequent daily contact and, at times, multiple calls per day—all indicating that Harry and Maxwell were working together to misappropriate Vane Trade Secrets and other confidential information, and conveying that information to Barbarise for use by the Ankora Entities.

135. In December 2025, leading up to Maxwell's resignation on December 26, Harry and Maxwell accessed, downloaded, photographed, and/or printed numerous Vane documents containing Vane Trade Secrets and other confidential company or customer information. Vane has reason to believe that during this period, Harry and Maxwell conveyed such information to Barbarise for use by the Ankora Entities.

136. Based on the data presently available to Vane from its review of Harry's work-issued phone, the brothers' call logs, and the brothers' work computer activity, Vane has identified

the following, while discovery is expected to reveal additional instances of misconduct and misappropriation.

**Harry Begins Assisting Barbarise in Ankora's Formation**

137.   Beginning shortly after Barbarise left Plaza Marine in mid-2023, Harry began reestablishing contact and discussed Barbarise's plans to build a business, including through multiple phone calls, text messages, and in-person lunch meetings.  For example:

a.   Between July 2023 and September 2023, Harry engaged in approximately five phone calls with Barbarise.

b.   On September 13, 2023, Harry reached out to Barbarise asking whether he knew anyone willing to provide a $100,000 loan. Barbarise responded that he would consider whether he knew a potential lender and noted that he may be in a position once he got back to work, and the two made plans to meet for lunch at the end of September.

c.   On or about September 28, 2023, Harry and Barbarise met for lunch.

d.   In October 2023, Harry and Barbarise spoke by phone on three occasions, with individual calls ranging from approximately 14 to 40 minutes in length.

e.   On October 6, 2023, following a 14-minute phone call between Harry and Barbarise, Harry sent Barbarise a text message encouraging him to seek Harry's assistance in "trying to build something," offering to "get creative in solutions" and inviting questions from Barbarise.

f.   In November 2023, Harry and Barbarise spoke on the phone at least 13 times.

38

g.      On or about November 28, 2023, Harry and Barbarise met for lunch, after which Harry thanked him for lunch and a "card," telling Barbarise he "didn't have to do that" but that it was "very much appreciated," and adding that they would "Talk soon."  Upon information and belief, the "card" Harry referred to was a gift or money card in exchange for the services and/or confidential Vane information that he was providing to Barbarise.

138.    As Ankora prepared to begin, and then began, operations, Harry and Barbarise's communications increased in frequency, including periods of multiple calls per day.

a.      Between December 2023 and June 2024, Harry and Barbarise continued to speak on the phone regularly, sometimes multiple times per day.

b.      On July 3, 2024, Harry and Barbarise met for lunch.  After, Barbarise informed Harry by text that Ankora had made its "first delivery."

c.      On July 9, 2024 at 8:36 a.m., Harry sent Maxwell a text message informing him that Barbarise had created his own company and had requested to talk with Maxwell.  Harry told Maxwell, "Not sure if you heard, but John Barbarise started his own bunker supply company in NYH with the Barge James Joseph and the Tug Diane B. I know he did one job, probably a couple others, but has one coming up for the EVER FAME which we also have bunkers for. He's looking to talk with someone about coordinating that, and has specifically asked for you. Can I have him call you?"  That morning, at 10:18 a.m., Maxwell and Barbarise spoke on the phone for eight minutes.

d.      The next day, on July 10, 2024, Harry and Barbarise met for lunch.  After, Harry again thanked Barbarise for lunch and gifts, and an additional item Harry

39

referred to only as "the other," with Harry stating, "thank you for lunch and the Yeti. The shirt is great, really nice - will absolutely wear it. *And of course thank you for the other. Really didn't have to do that and it's too much, but I really, really do appreciate it, thank you very much John. Will make sure we get this thing done*. Talk soon and thanks again man."  Barbarise responded by thanking Harry for his "help" and "support," and noting that he "hope[s] it works out" and felt good that Harry was going to "try [his] best."  Harry responded stating he was "confident we'll get it done."  On information and belief, the "other" referred to an additional item of value provided to Harry in exchange for the "help" and "support" he was providing to Barbarise in connection with Ankora's business.

e.      During July and August 2024, Harry and Barbarise continued to communicate regularly by phone, exchanging at least 71 calls.

**Harry and Barbarise Shift Communications Off Vane Systems**

139.    As their communications continued and increased, Harry and Barbarise took steps to avoid detection by Vane by shifting communications off Vane systems, while expressly acknowledging that Vane could monitor Harry's work email.  At the same time, Harry began transmitting Vane confidential documents to his personal Gmail account.  For example:

a.      On August 3, 2024, Barbarise asked Harry for his personal email address so that Barbarise could forward Harry an email he sent to other Vane employees, stating, "Unless you don't care if I send to vane but I'm sure they can see your emails."  Harry agreed, stating, "No, they can for sure" and telling Barbarise that "Personal is better."  Barbarise then replied that the email had been "Sent" and instructed Harry to "Please just keep between us."

b.      In August 2024, Barbarise sent Harry text messages requesting updates on a "list" Harry was preparing for him.  These communications coincided with Harry transmitting copies of Vane's monthly bunker and tonnage reports—containing a monthly record of all vessels bunkered by Vane and associated tonnage—from his Vane email account to his personal Gmail account.

c.      On August 9, 2024, Barbarise sent Harry a text message asking, "Any Luck with my list," to which Harry responded,  "yeah, started working on it today, got through 3-4 barges before getting pulled into other stuff, but I'll have it for you tomorrow morning - am working this weekend and will have time to finish the others, sorry man."

d.      The following day, on August 10, 2024, Harry sent to his personal Gmail a copy of Vane's monthly bunker and tonnage reports for June, July, and August 2024.

e.      On August 29, 2024, Barbarise asked Harry for an updated "list" for August. The next day, on August 30, 2024, Harry sent to his personal Gmail an updated copy of the monthly bunker and tonnage report for August 2024.  Upon information and belief, the referenced "list" Harry prepared and sent to Barbarise was, or contained information from, Vane's monthly tonnage reports.  These reports contain commercially sensitive information about fuel demand patterns, among other things, and access would provide a significant competitive advantage to Ankora.

41

**Harry Attempts to Bring Maxwell Into the Scheme**

140.   During September and October 2024, Harry and Barbarise continued to communicate regularly by phone, exchanging at least 68 calls, along with frequent text messages. During this time, Harry attempted to further connect Maxwell with Barbarise, while Maxwell expressed hesitancy and concern about the ongoing Plaza Marine litigation.  For example, on October 2, 2024, Harry sent Maxwell a text message asking if Maxwell wanted to go to Phillies playoff game with Barbarise and one of Barbarise's customers.  Maxwell responded that he "really [didn't] think that's a good idea," citing the Plaza Marine lawsuit.  Maxwell told Harry to "be careful with that" and suggested that he get approval from Vane leadership.  Harry replied that he had similar concerns and noted that he would politely decline the invitation.

**Harry Provides Ankora with Ongoing "Support" Through Vane Confidential Information**

141.   Through the end of 2024 and into 2025, Harry continued to provide "support" to Barbarise and Ankora's business by supplying Barbarise with Vane's confidential information. During this same period, Harry and Barbarise communicated frequently by phone and text message, exchanging at least 157 calls between November 2024 and January 2025, while simultaneously engaging in ongoing discussions regarding the terms of a potential role for Harry at Ankora.  For example:

> a.    On the morning of October 10, 2024, Barbarise requested information from Harry concerning two jobs, which Harry provided.  Barbarise then asked Harry to call him, and Harry responded by asking whether Barbarise needed him "in front of a computer."  On information and belief, Harry's statement reflects that he understood Barbarise's requests might require real-time access to Vane systems.

b.      Later that day, Harry and Barbarise met for lunch, after which Harry once again thanked Barbarise "very much for the cards, for lunch, and the vote of confidence."

c.      Also on October 10, 2024, Harry saved a note to his work-issued phone titled "Ankora part1," which documented the terms of a potential position with Ankora.  The note detailed proposed compensation and incentives, expected work location, job responsibilities, staffing and hiring plans, the company's current and projected financial performance, and litigation risk, which on information and belief, was referencing the Plaza Marine litigation.

d.      On November 11, 2024, Harry asked Maxwell to discuss the details of an Ankora job.  In response, Maxwell asked if Harry was "just overseeing this as a favor to John," to which Harry responded that he was.  On information and belief, Maxwell's response reflects that he understood Harry's request to be unusual and outside the normal course of business.

e.      On or about November 19, 2024, after obtaining approval from Vane for a day off, Harry met with Barbarise at Ankora's offices in New Jersey.  On information and belief, the purpose of this meeting was to discuss the details of a potential position at Ankora.

f.      On December 2, 2024, Barbarise and Harry made plans to speak by phone after Harry finished work to discuss "the other." That same day, Harry sent Barbarise a series of text messages stating that he "would like to come and spend another day with you guys at the office, go over things a little bit more," and asking: "where does [Stephen] Bragoli live and would it be possible to spend a day with

43

him ahead of making my decision?" Stephen Bragoli is the former owner of American Petroleum, from whom the Ankora Entities acquired their barges and tugs. Harry further stated that he "[c]ould spend a day with [Bragoli] on one of the tugs/barges whenever is convenient for him." That evening, at 6:03 p.m., Harry and Barbarise spoke by phone for 22 minutes. Following the call, Harry sent Barbarise an additional text message proposing to "tentatively plan for next Monday getting together at your office," and asking Barbarise to arrange a meeting with Bragoli. Harry further expressed concern that Bragoli "didn't visit the vessels at all," noting that spending time with Bragoli would be important to his decision-making process.

g.      On December 31, 2024, Barbarise asked Harry for a call, to which Harry again replied by asking if Barbarise needed Harry "in front of [a] computer."

h.      On January 23, 2025, Harry and Barbarise met in person. That same day, Harry saved a note on his work-issued phone titled "Ankora part 2," which further documented ongoing discussions regarding a potential position with Ankora. The note reflected detailed discussions concerning, among other things, proposed compensation and salary ranges, potential relocation, how Barbarise's brother—Zach Barbarise—"fit in with everything," and the financial performance and profitability of Ankora, including projections with and without pending litigation. The note further stated "Larger share if can complete joint venture with Vane - some sort of incentive or extra benefit from that money specifically." At the time, Ankora was actively pitching a joint venture proposal to Vane, which Vane ultimately rejected. Upon information and belief, these communications reflect

44

Harry's efforts, while still employed by Vane and owing fiduciary duties to the company, to advance discussions that could have positioned him to obtain a financial benefit tied to a potential transaction between Ankora and Vane.

142.    On February 10, 2025, Harry sent a text message to Maxwell and another Vane employee praising Vane's proprietary SAIL system and stating, among other things, "give me SAIL, and I can run the entire company from just that program alone." The message reflects Harry's recognition that SAIL serves as a centralized operational platform containing the core information necessary to operate Vane's business, underscoring the system's proprietary and competitively sensitive nature.

143.    Between February and March 2025, Harry and Barbarise continued to communicate frequently, exchanging at least 120 phone calls and meeting in person, with Harry continuing to provide Barbarise with Vane's customer information, which on information and belief, was provided in exchange for gifts and "cards." For example, on or about March 6, 2025, Harry and Barbarise met for lunch again, after which Harry once again thanked Barbarise "for the cards and for lunch," adding that the two would "talk soon and get this sorted." On information and belief, "this" referred to ongoing discussions regarding Harry's potential employment with Ankora. Later that afternoon, Harry provided Barbarise with the contact information for one of Vane's customers and offered to make introductions on Barbarise's behalf.

144.    On or about March 3, 2025, Vane concluded its remaining work for Ankora. After that date, Vane had no ongoing business relationship with Ankora.

**Contacts Persist After Vane's Work for Ankora Ends**

145.    Even though Vane no longer had ongoing business with Ankora, Harry's contacts with Barbarise persisted and intensified. Between April and May 2025, Harry and Barbarise

45

continued to communicate regularly by phone, exchanging at least 102 calls. During this same period, and despite the absence of any ongoing business between Vane and Ankora, Maxwell also exchanged at least 19 phone calls with Barbarise, in addition to frequent calls between Harry and Maxwell shortly before or after their communications with Barbarise. On information and belief, during this time, Harry was actively coordinating Maxwell's involvement in his communications with Barbarise to further Ankora's business interests.

146.   On April 9, 2025, during the same period in which Harry and Maxwell were communicating frequently with Barbarise despite the absence of any ongoing business between Vane and Ankora, Maxwell sent Harry a text message stating he "hope[d] Vane doesn't read [his] texts or have [his] phone bugged."

**Maxwell Becomes an Active Participant in the Ankora Communications**

147.   Over the following months, Maxwell's involvement in Harry's communications and dealings with Barbarise solidified. For example:

a.   On July 5, 2025, Harry and Barbarise made plans to meet for lunch later that week. In a text message to Barbarise, Harry stated that he would "get with Max[well] this weekend and let you know about Phillies game." Barbarise responded, "Phillies game, golf, golf and dinner, whatever you guys want to do."

b.   On July 15, 2025, Barbarise sent Maxwell and Harry a text message requesting the sailing times for a specific vessel, and Maxwell provided the requested information. On information and belief, this exchange reflects Maxwell and Harry assisting Barbarise and Ankora with daily dispatching and scheduling functions. By virtue of their roles at Vane, Maxwell and Harry had access to consolidated, real-time operational information gathered and maintained by Vane's

46

logistics personnel regarding vessel movements, port activity, and related conditions nationwide. Providing such information to Barbarise enabled Ankora to benefit from Vane's logistics infrastructure and real-time intelligence without maintaining comparable resources, thereby conferring a substantial competitive advantage.

c.    On July 17, 2025, Maxwell told Harry that he was "committed to pursuing other options with" Harry.

d.    On or about July 21, 2025, Harry, Maxwell, Barbarise, and Ankora employee Ross Grill participated together in a golf outing. In text messages exchanged with the brothers prior to the outing, Barbarise asked whether Harry and Maxwell would be interested in staying overnight after golf, stating that the stay would be "[o]n us of course." These communications support a belief that Barbarise and/or the Ankora Entities paid for or subsidized the brothers' participation in the golf outing in exchange for the services and confidential Vane information that they were providing to Barbarise and the Ankora Entities.

148.    In August and September 2025, Harry and Maxwell continued to communicate regularly with Barbarise by phone, with Harry and Barbarise exchanging at least 103 calls, and Maxwell and Barbarise exchanging at least 68 calls. During this time, Harry acknowledged that Ankora was a competitor to Vane. On September 8, 2025, in messages to Vane's Director of Chartering, Harry acknowledged that "with [Ankora] now owning the equipment" they are a "competitor."

47

**Schmitt Brothers Access SAIL and Other Proprietary Systems During Calls with Barbarise**

149.     Despite acknowledging that Ankora was a competitor, the Schmitts communications with Barbarise persisted and intensified over the following months—with calls to Barbarise often closely timed with calls between the brothers—supporting the inference that Harry and Maxwell were coordinating to provide confidential information and services to Barbarise while still employed by Vane.  In October and November 2025, Harry and Maxwell continued to communicate regularly with Barbarise by phone, with Harry and Barbarise exchanging at least 108 calls, and Maxwell and Barbarise exchanging at least 93 calls.  During many of their calls with Barbarise, the brothers accessed Vane's proprietary SAIL system, including to review confidential and sensitive Vane information about active jobs for customers for whose business Vane competed directly with Ankora, and who were themselves competitors of Ankora.  The Schmitts' repeated access to SAIL and deliberate review of this information during calls with Barbarise supports a reasonable inference that they were conveying such information to Barbarise in real time.  For example:

   a.     On October 20, 2025, while on a four-minute phone call with Barbarise, Maxwell accessed SAIL and viewed sensitive information about active jobs for a Vane customer ("Customer A") that directly competes with the Ankora Entities, including information concerning ship timing, product, and quantities.

   b.     On October 22, 2025, Maxwell accessed SAIL, this time during a five-minute phone call with Barbarise, and viewed similarly sensitive information for Customer A.

   c.     On October 27, 2025, while on a 30-minute phone call with Barbarise, Harry accessed SAIL and reviewed sensitive information for Customer A,

48

including multiple active and historical jobs in both the Philadelphia and New York regions.  That day, Maxwell had multiple phone calls with Barbarise, during which he accessed SAIL and reviewed the details of multiple active jobs for Customer A.

d.         On October 30, 2025, while on separate phone calls with Barbarise, both Harry and Maxwell accessed and searched SAIL for specific vessels and ship locations.

e.         In November 2025, Harry also exchanged multiple calls with Barbarise on the weekends, despite Harry no longer doing weekend dispatching work for Vane. For example, on Saturday November 1, 2025, during a four-minute phone call with Barbarise, Harry accessed and searched the SAIL system for jobs associated with a specific barge.

f.         On November 3, 2025, during a fifteen-minute phone call with Barbarise, Harry accessed and searched the SAIL system for jobs associated with a specific barge.

g.         On November 4, 2025, during a six-minute phone call with Barbarise, Maxwell accessed confidential information concerning the load order for Customer A via accessing Maxwell's colleague's email.

h.         On November 5, 2025, while on a ten-minute phone call with Barbarise, Maxwell accessed SAIL and viewed historical and active jobs for Customer A and another customer ("Customer B") that also directly competes with Ankora, including the communication logs documenting the ship timing of the active jobs for these customers.

150.    In November 2025, Harry enlisted another Vane employee to assist in his efforts to misappropriate Vane's confidential information, misleading the employee into believing the work was being done for Vane. On November 7, 2025, Harry sent text messages to a Vane Barge Captain requesting what he described as "Basically just a library of 'how to' things when working at Vane." Harry explained that he was compiling "one source guide for info on everything," including "proper VoyStart/VoyEnd times, to NORs and fuel readings, to Billing and Voyage updates / recaps (those are shoreside things), to now [sic] this and how to properly submit barge paperwork - all like step by step tutorials w/ pictures and screenshots to show people how to do the most basic of things." Upon information and belief, Harry was compiling this information for the benefit of Barbarise and the Ankora Entities, as Vane is aware of no legitimate business purpose for such a request. Additionally, the requested materials included information relating to Vane's proprietary "Ullage Program," an in-house platform developed by Vane's software team that standardizes onboard documentation and provides Vane with a significant operational and competitive advantage over competitors that rely on manual processes. On November 10, 2025, the same Vane employee sent Harry the requested information.

151.    Throughout November and December, the Schmitts continued their frequent calls with Barbarise while accessing the SAIL system to review confidential and sensitive Vane information. For example:

    a.    On November 10, 2025, while on an 11-minute phone call with Barbarise, Harry accessed SAIL and reviewed multiple active and historical jobs for Customer A, in addition to accessing confidential reports for the same customer and a private and confidential customer contract. Later in the day, during a twenty-one minute

phone call with Barbarise, Harry accessed and viewed a list of contacts in the SAIL system, as well as open orders associated with a specific barge.

b.       On November 12, 2025, while on a seven-minute phone call with Barbarise, Harry accessed and viewed one of Vane's barge contracts.

c.       The following day, on November 13 2025, during phone calls with Barbarise, Harry again accessed and viewed information in the SAIL system, and further tracked various vessel locations on the Delaware river.

d.       On November 17, 2025, while on a phone call with Barbarise, Maxwell accessed the SAIL system and viewed the details of several active jobs for Customer A.

e.       On November 18, 2025, while on a phone call with Barbarise, Maxwell again accessed the SAIL system and viewed the details of active jobs for Customer A.

f.       On November 24, 2025, while on a phone call with Barbarise, Maxwell accessed and searched the SAIL system for multiple vessels. That same day, while on a seven-minute phone call with Barbarise, Harry accessed and searched the SAIL system for barge orders associated with a specific barge.

g.       On November 25, 2025, while on a phone call with Barbarise, Harry accessed vTracker and reviewed the URT Deep Draft Offshore Platform near Northville. Harry then researched Long Island Sound weather conditions for November 25 to 28, 2025, consistent with a suspected Ankora-related operation near United Riverhead Terminal. Upon information and belief, there was no

51

legitimate business purpose for this search, as the last Vane job at United Riverhead Terminal occurred in August 2025.

h.      On November 26, 2025, while on a seven-minute phone call with Barbarise, Maxwell accessed the SAIL system and viewed the schedule for Customer A's charter barge.  Later that morning, while on a six-minute phone call with Barbarise, Maxwell again accessed the SAIL system and searched for jobs associated with a specific vessel.

i.      On December 9, 2025, while on a phone call with Barbarise, Maxwell accessed the SAIL system and searched for jobs related to multiple vessels.

j.      On December 11, 2025, while working remotely from home, Maxwell had an 18-minute phone call with Barbarise (notably longer than his typical calls with Barbarise while in the office), during which he accessed the SAIL system and methodically reviewed multiple bunker jobs for Customer A.

k.      On December 12, 2025, while on the phone with Barbarise, Maxwell accessed SAIL and viewed key job details for a bunker job for Customer A, including barge timing, ship timing, products, and quantities.

**Harvesting of Confidential Information in the Final Weeks of Employment**

152.    In December 2025, the Schmitts escalated their efforts to take and retain Vane's confidential information and took steps to conceal those activities. On information and belief, these actions were undertaken in anticipation of Maxwell's planned resignation from Vane later that month.  For example:

a.      On Sunday, December 14, 2025 at 4:30 p.m., outside working hours and the same day Maxwell notified his supervisor that he would not be reporting to work

that week for undisclosed personal reasons, Maxwell attempted to activate the camera on his company laptop, but was unsuccessful in doing so. Immediately afterwards, he proceeded to view numerous confidential Vane and customer documents on the SAIL system that he had no legitimate reason to access.

b.      Later that evening, shortly after ending a call with Harry, Maxwell accessed the SAIL system and created a test job that enabled him to systematically select and view nearly every New York Harbor terminal (where Ankora primarily operates) and the associated terminal notes containing years of aggregated proprietary data and knowledge. On information and belief, Maxwell attempted to activate the camera to capture images of the confidential information he then proceeded to review. Each terminal note was viewed only briefly before the cursor became stationary, behavior consistent with screen capture using an external device. On information and belief, after being unable to use his laptop camera, Maxwell photographed the information displayed on his screen using a separate phone or camera. Maxwell also accessed vTracker and viewed numerous major terminals throughout New York Harbor, including several frequently used by Ankora. Collectively, this activity was highly unusual for a Sunday evening when Maxwell was not scheduled to work and would have been atypical even during regular business hours. The timing and sequence of these events are particularly concerning given that they occurred the same evening Maxwell informed his supervisor that he would be absent from work for the upcoming week.

c.      Also on the same day, Harry sent to his personal Gmail an excel spreadsheet titled "Christmas Presents." The spreadsheet contained multiple hidden sheets

containing information about confidential Vane rates and crew lists. On information and belief, Harry transferred this file to his personal account to retain and conceal Vane's confidential information for use outside of Vane's systems.

153. As December 2025 progressed, Harry and Maxwell's conduct reflected coordinated, real-time assistance to Barbarise and Ankora while both remained employed by Vane. Their communications with Barbarise intensified and were closely timed with each other, and those communications repeatedly coincided with Harry's and Maxwell's accessing and viewing Vane's confidential and proprietary information. On information and belief, during this period the brothers were effectively working with Barbarise on Ankora-related operations while simultaneously harvesting Vane's confidential information for that purpose. For example:

a. On December 15, 2025 at 5:19 p.m., Harry had a 12-minute phone call with Barbarise. Shortly after, Maxwell had an 11-minute phone call with Barbarise.

b. On December 16, 2025, Ankora's tug arrived at the Skaggs Walsh Flushing Bay Pier near Rikers Island at approximately 8:00 a.m. Shortly after arrival, phone activity between Maxwell, Harry, and Barbarise increased noticeably, coinciding with typical arrival-related operational activities such as securing the vessel, connecting hoses, and completing paperwork. Phone activity increased again around midday, corresponding with the tug's departure from the terminal at approximately 12:00 p.m. Additional calls were exchanged among Maxwell, Harry, and Barbarise during this window, closely aligning with standard departure and post-operation activities. Between 1:15 and 5:14 p.m., after the tug departed the terminal, Harry and Barbarise exchanged an additional five phone calls.

c.      On December 16, 2025, around 8:30 a.m., Harry printed a co-worker's email containing confidential Vane information, specifically, a confidential customer contract.  On information and belief, Harry printed these materials to retain physical copies of Vane's confidential information for use outside of Vane's systems.  Harry also attempted to print another document, but the print job failed due to paper depletion.

d.      Between December 16 and December 18, 2025 Maxwell and Harry had extensive phone communication with Barbarise, despite Maxwell being out of office on December 17 and 18.  Specifically, Maxwell and Harry had at least 23 calls with Barbarise during this period.

e.      On December 19, 2025, Maxwell downloaded a copy of a confidential contract for one of Vane's largest customers.

f.      On December 20, 2025, Harry purchased a new printer using Vane funds. On information and belief, the timing of this purchase—coming immediately after Harry's recent printing attempts of confidential materials—reflects an effort to facilitate the printing and retention of Vane's confidential information outside of Vane's systems.

g.      On December 22, 2025, Ankora's tug appears to arrive to Westmore Fuel Co Port Chester Wharf between 12:30 p.m. and 1:00 p.m., at which point Harry and Maxwell had phone calls with Barbarise and each other at 1:15 p.m. (Harry and Barbarise), 1:20 p.m. (Maxwell and Barbarise), 1:36 p.m. (Harry and Maxwell), and 1:54 p.m. (Harry and Maxwell).

h. On Christmas Eve, December 24, 2025, Harry accessed sensitive pricing and customer contract information—including numerous contracts in the Contract Gantt—and additionally accessed and printed another confidential customer contract and multiple proprietary training documents.

i. On December 26, 2025, **the date Maxwell submitted his resignation**, Harry spent several hours accessing and viewing an astounding array of Company documents, including, among others: (i) blank Bunker Delivery Receipts for multiple customers in the Fleet Logistics Portal; (ii) proprietary Company training procedures and manuals, including the NYH Bunkers Tribal Knowledge, Vane Line Bunkering Vessel Response Plan, SMS – Tank Barge Operations Procedures Manual, and the Vane Line Bunkering LLC Health and Safety Plan, among others; (iii) Standard Time Charter Template; (iv) a barge list; and (v) Vane customer sample documents and letters. There was no valid work-related reason for this.

j. On December 30, 2025, shortly after Vane accepted Maxwell's resignation, he erased all data from his work-issued phone. Records indicate that Vane accepted Maxwell's resignation in person in the Baltimore office, effective immediately, around 10:00 a.m. on December 30. Maxwell's work-issued phone was still active, and all data was intact at approximately 10:30 a.m. Maxwell told his supervisors that he could not return his work-issued phone or computer at that time because he did not bring them to work and they were at his home. However, when the devices were confiscated and turned over to Vane later that morning, all data had been erased from the phone. That data belonged to Vane—as Vane's IT policy, to which

Maxwell agreed, put it, "All materials, created, sent, received or stored using Vane's IT systems are the sole property of Vane Brothers."

154. As a result of the foregoing conduct known to date, and on information and belief additional conduct to be identified after further investigation and discovery, Harry and Maxwell covertly worked with Barbarise to misappropriate the Vane Trade Secrets and other confidential information on behalf of the Ankora Entities.

155. By committing the above actions, all Defendants acted without the authorization of Vane and by improper means, while also using and disclosing the Vane Trade Secrets with full knowledge that the secrets were improperly acquired and acquired contrary to Harry and Maxwell's duties to maintain the secrecy of the Vane Trade Secrets and other confidential information.

156. At all times that Barbarise committed the above actions, he acted as a key employee of, on behalf of, and for the benefit of, the Ankora Entities.

157. Upon information and belief, based on the timing and nature of Harry and Maxwell's activity, the above described actions were undertaken in coordination and in furtherance of providing services to Barbarise and the Ankora Entities.

158. Upon information and belief, Harry and Maxwell accessed, downloaded, and/or printed the Vane Trade Secrets and other confidential information not for legitimate business reasons, but to misappropriate same for the benefit of themselves, Barbarise, and the Ankora Entities, in order to assist the Ankora Entities is gaining an unfair competitive advantage over Vane for monetary gain and to provide services to, or secure employment with, the Ankora Entities.

159. Upon information and belief, Harry and Maxwell, used company time, systems, and confidential and proprietary information to provide services to Barbarise and the Ankora

Entities while they were working for Vane, including some services that were the same as, or substantially similar to, the services they were employed to provide to Vane.

160.    Upon information and belief, Barbarise and the Ankora Entities had knowledge of, condoned, participated in, and encouraged the unlawful access to and use of the Vane Trade Secrets and confidential information as described herein.

161.    As a result of Defendants' actions, Ankora and Barbarise were able to solicit work away from Vane's longstanding customers, undercut prices and price margins, replicate Vane's exact manner of business, and misappropriate and use the Vane Trade Secrets for their wrongful benefit and to the detriment of Vane, including by diverting bunkering work from Vane in the New York region.

162.    Furthermore, because both Harry and Maxwell were key employees for Vane and had access to the Vane Trade Secrets, and based on their prior communications with Barbarise— including Harry's discussions regarding a future role with the Ankora Entities—as well as the brothers' increased accessing, downloading, and printing of Vane Trade Secrets shortly before Maxwell's sudden resignation, it is reasonable to believe that Harry and Maxwell will continue to misappropriate, use, and disclose the Vane Trade Secrets, including disclosing to Barbarise and the Ankora Entities.

163.    Defendants' wrongful actions have caused, and continue to cause, Vane significant damages and irreparable harm in its profits, its reputation, and the goodwill that it has with its longstanding customers.

164.    Defendants' conduct as described herein was intentional, deliberate, and wanton as Defendants have willfully and maliciously misappropriated the Vane Trade Secrets.

**I.     Vane Sends the Demand Letters.**

165.    On January 8, 2026, based on its review of the Schmitts' activity, Vane sent separate letters to Harry and Maxwell through counsel addressing concerns regarding their misappropriation of Vane's confidential information and breaches of their contractual obligations.

166.    In those letters, Vane demanded that Harry and Maxwell immediately cease and desist from using, accessing, disclosing, or disseminating any of Vane's confidential and proprietary information.

167.    Both Maxwell and Harry confirmed in writing that they would comply with the non-competition and non-solicitation provisions in their Agreements and would refrain from disclosing Vane's confidential information to any third party.

**FIRST CLAIM**
**Violation of Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836,** *et seq.*
**(Against all Defendants)**

168.    Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 167 above, as if fully set forth herein.

169.    Plaintiffs have developed and own valuable trade secrets related to their products and services that are used in, or intended for use in, interstate commerce.  These are the Vane Trade Secrets, as defined above.

170.    The Vane Trade Secrets are not generally known to the public, are not readily ascertainable, and derive independent economic value to Plaintiffs from this secrecy.

171.    Plaintiffs have expended significant resources, including time and money spent over multiple decades, to develop the Vane Trade Secrets.

172.    Plaintiffs have taken reasonable measures to safeguard the Vane Trade Secrets by: (a) contractually binding its employees, including Harry and Maxwell, to maintain the confidentiality of the Vane Trade Secrets; (b) implementing written policies and procedures,

59

including those set forth in the Employee Handbook, governing the protection and use of confidential information; and (c) securing their proprietary business systems through the access controls, monitoring, and safeguards described herein.

173. Defendants misappropriated the Vane Trade Secrets by taking them from Plaintiffs and acquiring, using, and disclosing them without authorization, and by improper means, for their own personal benefit and for the benefit of the Ankora Entities' business.

174. Harry and Maxwell disclosed and used the Vane Trade Secrets without Plaintiffs' consent, and with full knowledge that the Vane Trade Secrets were acquired by improper means and/or under circumstances giving rise to a duty to maintain their secrecy and limit their use.

175. Barbarise and the Ankora Entities acquired and used the Vane Trade Secrets without Plaintiffs' consent, knowing that the trade secrets were acquired by improper means and/or under circumstances giving rise to a duty to maintain their secrecy and limit their use.

176. Defendants have obtained an economic benefit from the theft of the Vane Trade Secrets in order to utilize them to compete in the exact same line of business as Plaintiffs, operating in the same region as Plaintiffs operate, communicating with the same customers as Plaintiffs, and offering the same services as Plaintiffs.

177. At all times, Defendants knew that the acquisition and use of the Vane Trade Secrets was improper and unlawful.

178. Upon information and belief, Defendants have retained the Vane Trade Secrets without authorization.

179. Upon information and belief, Defendants' misappropriation was undertaken to obtain an unfair competitive advantage over Plaintiffs, including by enabling the Ankora Entities

to compete for and service customers, undercut pricing and margins, and replicate Plaintiffs' methods of operating their business.

180. As a result of Defendants' misappropriation and misuse, Plaintiffs have suffered and continue to suffer injury that cannot be adequately or fully remedied at law or by the assessment of damages against them, and therefore Plaintiffs seek injunctive relief preliminarily and permanently prohibiting Defendants and anyone acting in concert with them or on their behalf to possess, use or access the Vane Trade Secrets.

181. Plaintiffs further seek an Order requiring Defendants to submit their electronic devices to a forensic expert for imaging, at their expense, to evaluate the extent to which they have used or disclosed the Vane Trade Secrets.

182. Plaintiffs further seek an Order requiring Defendants to return any hard copies, and to destroy any electronic copies, of any of the Vane Trade Secrets after the forensic images have been created.

183. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer harm, including the loss of the confidentiality of their confidential business information, loss of business, loss of profits, and loss of customer goodwill, and other damages that continue to accrue to the present, in an amount to be determined at trial.

184. Defendants have been unjustly enriched as a result of their misappropriation of the Vane Trade Secrets, entitling Plaintiffs to recover damages for unjust enrichment to the extent such enrichment is not otherwise accounted for in calculating Plaintiffs' actual losses.

185. Defendants' conduct was willful and malicious, entitling Plaintiffs to an award of exemplary damages equal to twice the amount of all other monetary damages and reasonable attorneys' fees under the DTSA.

**SECOND CLAIM**
**Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.***
**(Against Harry Schmitt and Maxwell Schmitt)**

186.    Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 167 above, as if fully set forth herein.

187.    Plaintiffs have developed and own valuable trade secrets related to their products and services that are used in, or intended for use in, interstate commerce.  These are the Vane Trade Secrets, as defined above.

188.    The Vane Trade Secrets are not generally known to the public, are not readily ascertainable, and derive independent economic value to Plaintiffs from this secrecy.

189.    Plaintiffs have expended significant resources, including time and money spent over multiple decades, to develop the Vane Trade Secrets.

190.    Plaintiffs have taken reasonable measures to safeguard the Vane Trade Secrets by: (a) contractually binding its employees, including Harry and Maxwell, to maintain the confidentiality of the Vane Trade Secrets; (b) implementing written policies and procedures, including those set forth in the Employee Handbook, governing the protection and use of confidential information; and (c) securing their proprietary business systems through the access controls, monitoring, and safeguards described herein.

191.    Harry and Maxwell misappropriated the Vane Trade Secrets by taking them from Plaintiffs and using and disclosing them without authorization, and by improper means, for their own personal benefit and for the benefit of Harley Marine's business.

192.    Harry acquired, disclosed, and used the Vane Trade Secrets without Plaintiffs' consent, and with full knowledge that the Vane Trade Secrets were acquired by improper means and/or under circumstances giving rise to a duty to maintain their secrecy and limit their use.

193. Maxwell disclosed and used the Vane Trade Secrets without Plaintiffs' consent, and with full knowledge that the Vane Trade Secrets were acquired by improper means and/or under circumstances giving rise to a duty to maintain their secrecy and limit their use.

194. Harry and Maxwell have obtained an economic benefit from the theft of the Vane Trade Secrets in order to utilize them to enable Harley Marine to compete in the exact same line of business as Plaintiffs, operating in the same region as Plaintiffs operate, communicating with the same customers as Plaintiffs, and offering the same services as Plaintiffs.

195. At all times, Harry and Maxwell knew that the acquisition and use of the Vane Trade Secrets was improper and unlawful.

196. Upon information and belief, Harry and Maxwell's misappropriation was undertaken to obtain an unfair competitive advantage over Plaintiffs, including by enabling Harley Marine to compete for and service customers, undercut pricing and margins, and replicate Plaintiffs' methods of operating their business.

197. As a direct and proximate result of Harry and Maxwell's actions, Plaintiffs have suffered and continue to suffer harm, including the loss of the confidentiality of their confidential business information, loss of business, loss of profits, and loss of customer goodwill, and other damages that continue to accrue to the present, in an amount to be determined at trial.

198. Harry and Maxwell have been unjustly enriched as a result of their misappropriation of the Vane Trade Secrets, entitling Plaintiffs to recover damages for unjust enrichment to the extent such enrichment is not otherwise accounted for in calculating Plaintiffs' actual losses.

199.    Harry and Maxwell's conduct was willful and malicious, entitling Plaintiffs to an award of exemplary damages equal to twice the amount of all other monetary damages and reasonable attorneys' fees under the DTSA.

### THIRD CLAIM
### Violation of Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Cts. & Jud. Code § 11-1201, *et seq.*
### (Against all Defendants)

200.    Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 167 above, as if fully set forth herein.

201.    Plaintiffs have developed and own valuable trade secrets related to their products and services.  These are the Vane Trade Secrets, as defined above.

202.    The Vane Trade Secrets are not generally known to the public, are not readily ascertainable, and derive independent economic value to Plaintiffs from this secrecy.

203.    Plaintiffs have expended significant resources, including time and money spent over multiple decades, to develop the Vane Trade Secrets.

204.    Plaintiffs have taken reasonable measures to safeguard the Vane Trade Secrets by: (a) contractually binding its employees, including Harry and Maxwell, to maintain the confidentiality of the Vane Trade Secrets; (b) implementing written policies and procedures, including those set forth in the Employee Handbook, governing the protection and use of confidential information; and (c) securing their proprietary business systems through the access controls, monitoring, and safeguards described herein.

205.    Defendants misappropriated the Vane Trade Secrets by taking them from Plaintiffs and acquiring, using, and disclosing them without authorization, and by improper means, for their own personal benefit and for the benefit of the Ankora Entities' business.

64

206.    Harry and Maxwell disclosed and used the Vane Trade Secrets without Plaintiffs' consent, and with full knowledge that the Vane Trade Secrets were acquired by improper means and/or under circumstances giving rise to a duty to maintain their secrecy and limit their use.

207.    Barbarise and the Ankora Entities acquired and used the Vane Trade Secrets without Plaintiffs' consent, knowing that the trade secrets were acquired by improper means and/or under circumstances giving rise to a duty to maintain their secrecy and limit their use.

208.    Defendants have obtained an economic benefit from the theft of the Vane Trade Secrets in order to utilize them to compete in the exact same line of business as Plaintiffs, operating in the same region as Plaintiffs operate, communicating with the same customers as Plaintiffs, and offering the same services as Plaintiffs.

209.    At all times, Defendants knew that the acquisition and use of the Vane Trade Secrets was improper and unlawful.

210.    Upon information and belief, Defendants have retained the Vane Trade Secrets without authorization.

211.    Upon information and belief, Defendants' misappropriation was undertaken to obtain an unfair competitive advantage over Plaintiffs, including by enabling the Ankora Entities to compete for and service customers, undercut pricing and margins, and replicate Plaintiffs' methods of operating their business.

212.    As a result of Defendants' misappropriation and misuse, Plaintiffs have suffered and continue to suffer injury that cannot be adequately or fully remedied at law or by the assessment of damages against them, and therefore Plaintiffs seek injunctive relief preliminarily and permanently prohibiting Defendants and anyone acting in concert with them or on their behalf to possess, use or access the Vane Trade Secrets.

213. Plaintiffs further seek an Order requiring Defendants to submit their electronic devices to a forensic expert for imaging, at their expense, to evaluate the extent to which they have used or disclosed the Vane Trade Secrets.

214. Plaintiffs further seek an Order requiring Defendants to return any hard copies, and to destroy any electronic copies, of any of the Vane Trade Secrets after the forensic images have been created.

215. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer harm, including the loss of the confidentiality of their confidential business information, loss of business, loss of profits, and loss of customer goodwill, and other damages that continue to accrue to the present, in an amount to be determined at trial.

216. Defendants have been unjustly enriched as a result of their misappropriation of the Vane Trade Secrets, entitling Plaintiffs to recover damages for unjust enrichment to the extent such enrichment is not otherwise accounted for in calculating Plaintiffs' actual losses.

217. Defendants' conduct was willful and malicious, entitling Plaintiffs to an award of exemplary damages equal to twice the amount of all other monetary damages and reasonable attorneys' fees under the MUTSA.

### FOURTH CLAIM
### Violation of Maryland Uniform Trade Secrets Act ("MUTSA"),
### Md. Cts. & Jud. Code § 11-1201, *et seq.*
### (Against Harry Schmitt and Maxwell Schmitt)

218. Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 167 above, as if fully set forth herein.

219. Plaintiffs have developed and own valuable trade secrets related to their products and services that are used in, or intended for use in, interstate commerce. These are the Vane Trade Secrets, as defined above.

220. The Vane Trade Secrets are not generally known to the public, are not readily ascertainable, and derive independent economic value to Plaintiffs from this secrecy.

221. Plaintiffs have expended significant resources, including time and money spent over multiple decades, to develop the Vane Trade Secrets.

222. Plaintiffs have taken reasonable measures to safeguard the Vane Trade Secrets by: (a) contractually binding its employees, including Harry and Maxwell, to maintain the confidentiality of the Vane Trade Secrets; (b) implementing written policies and procedures, including those set forth in the Employee Handbook, governing the protection and use of confidential information; and (c) securing their proprietary business systems through the access controls, monitoring, and safeguards described herein.

223. Harry and Maxwell misappropriated the Vane Trade Secrets by taking them from Plaintiffs and using and disclosing them without authorization, and by improper means, for his own personal benefit and for the benefit of Harley Marine's business.

224. Harry acquired, disclosed, and used the Vane Trade Secrets without Plaintiffs' consent, and with full knowledge that the Vane Trade Secrets were acquired by improper means and/or under circumstances giving rise to a duty to maintain their secrecy and limit their use.

225. Maxwell disclosed and used the Vane Trade Secrets without Plaintiffs' consent, and with full knowledge that the Vane Trade Secrets were acquired by improper means and/or under circumstances giving rise to a duty to maintain their secrecy and limit their use.

226. Harry and Maxwell have obtained an economic benefit from the theft of the Vane Trade Secrets in order to utilize them to enable Harley Marine to compete in the exact same line of business as Plaintiffs, operating in the same region as Plaintiffs operate, communicating with the same customers as Plaintiffs, and offering the same services as Plaintiffs.

227. At all times, Harry and Maxwell knew that the acquisition and use of the Vane Trade Secrets was improper and unlawful.

228. Upon information and belief, Harry and Maxwell's misappropriation was undertaken to obtain an unfair competitive advantage over Plaintiffs, including by enabling Harley Marine to compete for and service customers, undercut pricing and margins, and replicate Plaintiffs' methods of operating their business.

229. As a direct and proximate result of Harry and Maxwell's actions, Plaintiffs have suffered and continue to suffer harm, including the loss of the confidentiality of their confidential business information, loss of business, loss of profits, and loss of customer goodwill, and other damages that continue to accrue to the present, in an amount to be determined at trial.

230. Harry and Maxwell have been unjustly enriched as a result of their misappropriation of the Vane Trade Secrets, entitling Plaintiffs to recover damages for unjust enrichment to the extent such enrichment is not otherwise accounted for in calculating Plaintiffs' actual losses.

231. Harry and Maxwell's conduct was willful and malicious, entitling Plaintiffs to an award of exemplary damages equal to twice the amount of all other monetary damages and reasonable attorneys' fees under the MUTSA.

**FIFTH CLAIM**
**Breach of Contract**
**(Against Harry Schmitt)**

232. Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 167 above, as if fully set forth herein.

68

233. Harry entered into a valid agreement, the Harry Employment Agreement, with Vane that contained valid and reasonable non-competition, non-solicitation, and confidentiality clauses.

234. The Harry Employment Agreement provided adequate consideration to Harry in exchange for the provisions he agreed to in the contract, and is a binding contract between Vane and Harry.

235. Vane has performed all of its obligations under the Harry Employment Agreement.

236. Harry has materially breached the Harry Employment Agreement by:

a. Using Vane's time, systems, and the Vane Trade Secrets and other confidential information to provide services to the Ankora Entities, a direct competitor of Vane, while still employed by Vane, including performing work that was the same as or substantially similar to the work he was employed to provide to Vane;

b. Improperly accessing, taking, retaining, disclosing, and using the Vane Trade Secrets and other confidential information without authorization, and for the benefit of a competing business and to the detriment of Vane; and

c. Accessing, disclosing, and using the Vane Trade Secrets and other confidential information to compete with Vane and solicit work away from Vane's customers.

237. As a result of the breaches by Harry, Plaintiffs have suffered, and unless temporarily restrained and preliminarily and permanently enjoined by this Court, will continue to suffer irreparable harm for which there is no adequate remedy at law.

238. As a direct and proximate result of Harry's actions, Plaintiffs have suffered and continue to suffer significant harm, including lost business profits and opportunities, customer relationships, strategies, confidential information, property, and other resources, damaging Plaintiffs in an amount to be determined at trial.

239. By reason of the foregoing, Plaintiffs are entitled to recover monetary damages for breach of contract.

**SIXTH CLAIM**
**Breach of Contract**
**(Against Maxwell Schmitt)**

240. Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 167 above, as if fully set forth herein.

241. Maxwell entered into a valid agreement, the Maxwell Employment Agreements, with Vane that contained valid and reasonable non-competition, non-solicitation, and confidentiality clauses.

242. The Maxwell Employment Agreements provided adequate consideration to Maxwell in exchange for the provisions he agreed to in the contracts, and are binding contracts between Vane and Maxwell.

243. Vane has performed all of its obligations under the Maxwell Employment Agreements.

244. Maxwell has materially breached the Maxwell Employment Agreements by:

a.      Using Vane's time, systems, and the Vane Trade Secrets and other confidential information to provide services to the Ankora Entities, a direct competitor of Vane, while still employed by Vane, including performing work that was the same as or substantially similar to the work he was employed to provide to Vane;

b.      Improperly accessing, taking, retaining, disclosing, and using the Vane Trade Secrets and other confidential information without authorization, and for the benefit of a competing business and to the detriment of Vane; and

c.      Accessing, disclosing, and using the Vane Trade Secrets and other confidential information to compete with Vane and solicit work away from Vane's customers.

245.    As a result of the breaches by Maxwell, Plaintiffs have suffered, and unless temporarily restrained and preliminarily and permanently enjoined by this Court, will continue to suffer irreparable harm for which there is no adequate remedy at law.

246.    As a direct and proximate result of Maxwell's breaches, Plaintiffs have suffered and continue to suffer significant harm, including lost business profits and opportunities, customer relationships, strategies, confidential information, property, and other resources, damaging Plaintiffs in an amount to be determined at trial.

247.    By reason of the foregoing, Plaintiffs are entitled to recover monetary damages for breach of contract.

## SEVENTH CLAIM
### Breach of Fiduciary Duty
#### (Against Harry Schmitt)

248.    Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 167 above, as if fully set forth herein.

249.    By virtue of the Harry Employment Agreement and Harry's key position at Vane, Harry owed Vane a fiduciary duty and had a duty of loyalty to not take steps to compete with Vane while at the same time being an employee of Vane and receiving valuable compensation from Vane.

250.    Under the Harry Employment Agreement, Harry was prohibited from acting in any manner inconsistent with the Harry Employment Agreement and his role at Vane, and Harry was at all times obligated to exercise good faith and loyalty to Vane.

251.    Instead, while still employed by Vane, Harry breached his fiduciary duties by providing services to the Ankora Entities, a direct competitor of Vane, including performing work that was the same as or substantially similar to the work he was employed to provide to Vane.

252.    Harry further breached his fiduciary duties by wrongfully misappropriated Vane Trade Secrets and confidential information for the Ankora Entities' benefit.

253.    As a direct and proximate result of Harry's actions, Plaintiffs have suffered and continue to suffer significant harm, including lost business profits and opportunities, customer relationships, strategies, confidential information, property, and other resources, damaging Plaintiffs in an amount to be determined at trial.

254.    By reason of the foregoing, Harry is liable to Vane for monetary damages and disgorgement of all monies paid to Harry while he was acting in breach of his fiduciary duty.

72

**EIGHTH CLAIM**
**Breach of Fiduciary Duty**
**(Against Maxwell Schmitt)**

255.    Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 167 above, as if fully set forth herein.

256.    By virtue of the Maxwell Employment Agreements and Maxwell's key position at Vane, Maxwell owed Vane a fiduciary duty and had a duty of loyalty to not take steps to compete with Vane while at the same time being an employee of Vane and receiving valuable compensation from Vane.

257.    Under the Maxwell Employment Agreements, Maxwell was prohibited from acting in any manner inconsistent with the Maxwell Employment Agreements and his role at Vane, and Maxwell was at all times obligated to exercise good faith and loyalty to Vane.

258.    Instead, while still employed by Vane, Maxwell breached his fiduciary duties by providing services to the Ankora Entities, a direct competitor of Vane, including performing work that was the same as or substantially similar to the work he was employed to provide to Vane.

259.    Maxwell further breached his fiduciary duties by wrongfully misappropriated Vane Trade Secrets and confidential information for the Ankora Entities' benefit.

260.    As a direct and proximate result of Maxwell's actions, Plaintiffs have suffered and continue to suffer significant harm, including lost business profits and opportunities, customer relationships, strategies, confidential information, property, and other resources, damaging Plaintiffs in an amount to be determined at trial.

261.    By reason of the foregoing, Maxwell is liable to Vane for monetary damages and disgorgement of all monies paid to Maxwell while he was acting in breach of his fiduciary duty.

## NINTH CLAIM
## Civil Conspiracy
## (Against all Defendants)

262. Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 167 above, as if fully set forth herein.

263. All of the misconduct referenced herein was pursuant to an agreement or understanding between the Defendants to unlawfully misappropriate the Vane Trade Secrets and other confidential information and divert actual and potential customers from Plaintiffs toward the Ankora Entities' competing business and/or for Harry and Maxwell to secure employment with the Ankora Entities.

264. Each of the Defendants engaged in one or more unlawful or tortious acts in furtherance of this conspiracy or employed tortious means to accomplish an act not itself illegal, as described in this Complaint.

265. As the direct and proximate result of the Defendants' civil conspiracy, Plaintiffs have suffered and will continue to suffer significant harm, including lost business profits and opportunities, customer relationships, strategies, confidential information, property, and other resources, damaging Plaintiffs in an amount to be determined at trial.

266. As the direct and proximate result of the Defendants' civil conspiracy, Plaintiffs have suffered, and unless temporarily restrained and preliminarily and permanently enjoined by this Court, will continue to suffer irreparable harm for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court issue an Order:

A. Enjoining Defendants and anyone acting in concert with them or on their behalf from using, disclosing, accessing, communicating, using, copying, or removing any

74

documents, data, files, or images containing or derived from the Vane Trade Secrets, whether in any hard copy or electronic format;

B.      Requiring Defendants to submit all relevant electronic devices in their possession, custody and control to a forensic expert for imaging, at Defendants' expense, to evaluate the extent to which Defendants have used or disclosed the Vane Trade Secrets;

C.      Requiring Defendants to return any hard copies, and to destroy any electronic copies, of any of the Vane Trade Secrets;

D.      Awarding Plaintiffs monetary damages for the actual loss and unjust enrichment caused by Defendants' misappropriation of the Vane Trade Secrets, or, alternatively, awarding Plaintiffs reasonable royalty damages for Defendants' unauthorized disclosure and use of the Vane Trade Secrets;

E.      Awarding Plaintiffs exemplary damages under the DTSA and the MUTSA, in an amount equal to twice the amount of all other monetary damages, based on Defendants' willful and malicious conduct;

F.      Awarding Plaintiffs monetary damages equal to the direct and incidental damages of Harry Schmitt's and Maxwell Schmitt's breaches;

G.      Disgorgement of compensation paid to Harry Schmitt and Maxwell Schmitt during the periods in which they acted in breach of their contractual and fiduciary duties; and

H.      Awarding Plaintiffs all of their costs and expenses in pursuing this action, including reasonable attorneys' fees;

I.      Granting such other and further relief as the Court deems just and proper.

75

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated:    March 23, 2026                    Respectfully submitted,


                                            /s/ Allison J. Caplis
                                            Allison J. Caplis (Bar No. 27539)
                                            allison.caplis@hoganlovells.com
                                            **HOGAN LOVELLS US LLP**
                                            100 International Drive, Suite 2000
                                            Baltimore, MD 21202
                                            Telephone: (410) 659-2700
                                            Fax No.: (410) 659-2701

                                            Michael E. DeLarco (*pro hac vice forthcoming*)
                                            michael.delarco@hoganlovells.com
                                            Benjamin A. Fleming (*pro hac vice forthcoming*)
                                            benjamin.fleming@hoganlovells.com
                                            **HOGAN LOVELLS US LLP**
                                            390 Madison Avenue
                                            New York, NY 10019
                                            Telephone: (212) 918-3000
                                            Fax No.: (212) 918-3100

                                            *Attorneys for Plaintiffs*